[No. 6719-0–III.   Division Three.   March 25, 1986.]

DORIS A. STEELE, ET AL, *Appellants*, v. ORGANON, INC., ET AL, *Defendants*, SKAGGS DRUG CENTERS, INC., ET AL, *Respondents*.

*Dennis M. Sullivan,* for appellants.

*Michael C. Geraghty* and *Turner, Stoeve, Gagliardi & Goss,* for respondent Skaggs Drug.

*Diane M. Hermanson, Curtis L. Shoemaker,* and *Paine, Hamblen, Coffin & Brooke,* for respondents Welty.

THOMPSON, J.—Doris Steele appeals the Superior Court's summary dismissal of her medical malpractice action against Skaggs Drug Centers and Elizabeth Welty, M.D. The court determined the action was filed after the applicable statute of limitation had run. We affirm.

In late July 1973, Mrs. Steele was hospitalized under the care of Dr. Welty for a severe migraine headache. Upon discharge, Dr. Welty prescribed a drug called Wigraine, and Mrs. Steele had the prescription filled at a Skaggs drugstore. Directions advised her to take: "Two tablets at onset of headache. [R]epeat every half to one hour for three doses."

Wigraine is an ergot, a vascular constrictor, and though dosage should not exceed 10 to 12 tablets per week, Mrs. Steele began taking 8 tablets a day for her headaches. After approximately 3 weeks, she experienced loss of sensation in her arms and legs and was again admitted to the hospital, this time with ergot poisoning. Drs. Richard Kleaveland and Michael Judd, heart specialists, treated her until her symptoms subsided, at which time she was released. Some months later she returned to Drs. Kleaveland and Judd complaining of tingling in her hands and feet, which they diagnosed as Raynaud's Syndrome.

In September 1974, Mrs. Steele sought advice from an attorney as to whether she had a cause of action for damages resulting from the overdose. The attorney exchanged the following correspondence with Drs. Kleaveland and Judd:

Dear Dr. Judd:

. . .

. . . [P]lease advise:

1. What [e]ffects abuse of Wigraine can have on the vascular system.

2. Whether you have found indications of any damage to Mrs. Steele's vascular system which could be attributed, either as an original cause or as an aggravating factor, to Wigraine.

3. If you have found indications of damage to or disease of the vascular system in Mrs. Steele, to what do you attribute them if not to Wigraine.

Dr. Kleaveland replied:

January 8 1975

. . .

. . . In answer to your question one, Wigraine which

contains ergot causes diffuse spasm in the vascular system and if this is prolonged can induce ischemia or lack of circulation to the tissues with resultant damage to the tissues. In answer to question number two, Mrs. Steele was fortunate in that she recovered from this medication by withholding the medication permitting the level of ergotamine to fall and thus reduction in the spasm with restoration of normal circulation. In answer to question number three, patients may have a variety of different normally occurring vasospastic disorders causing tingling and color changes in the lower extremities, which may not be related to any medication. . . . The intervening period of time between the treatment in the hospital and the present symptoms would somewhat militate against being related to the medication.

A more detailed response followed on February 5, 1975. It stated that Mrs. Steele

did have reduction in circulation in the lower extremities [as a result of the overdose] but the pulses came back rather readily while in the hospital without any evidence of any ischemic changes. She was subsequently seen in our office following the discharge . . . without significant symptoms.

Dr. Kleaveland was of the opinion: "[I]t is highly improbable that there would be any relationship between this episode and her present symptoms [i.e., Raynaud's Syndrome]."

Based on the foregoing, damages from the overdose appeared limited to the August 1973 hospitalization. Since insurance had covered most of the expenses connected with that hospitalization, Mrs. Steele and her attorney decided the cost of a lawsuit could exceed the amount of recovery.

Then, in early December 1981, Mrs. Steele suffered a heart attack. She reentered the hospital in January 1982 for bypass surgery, and, while hospitalized, she suffered a stroke. Dr. Bozarth, a neurologist, told Mrs. Steele the stroke was unrelated to the heart surgery, but during her hospitalization she overheard Dr. Bozarth and another physician discussing the 1973 overdose episode in relation to her stroke. Subsequently, a doctor she consulted in

Hoquiam, Washington, advised her the heart attack and stroke were both related to the Wigraine overdose.

In December 1982, this action was filed against Dr. Welty, Skaggs Drug Centers, and Organon Pharmaceutical, the manufacturer of Wigraine. Organon was dismissed pursuant to stipulation of the parties. Dr. Welty and Skaggs moved for summary judgment contending the statute of limitation had run. The court granted the motion, stating Mrs. Steele "was aware of all of the elements of her cause of action . . . in the latter part of April, 1975", more than 7 years prior to commencement of this action.

At that time, RCW 4.16.350 provided:

> Any civil action for damages . . . against a member of the healing arts including, but not limited to, a physician . . . based upon alleged professional negligence shall be commenced within (1) three years from the date of the alleged wrongful act, or (2) one year from the time that plaintiff discovers the injury or condition was caused by the wrongful act, whichever period of time expires last.

Laws of 1971, ch. 80, § 1 (amended by Laws of 1975, 2d Ex. Sess., ch. 56, § 1). Initially, we note the foregoing statute of limitation does not begin to run until the plaintiff discovers or reasonably should have discovered all of the essential elements of his or her cause of action, *i.e.*, duty, breach, causation, damages. *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 511, 598 P.2d 1358 (1979). Mrs. Steele contends an issue of fact exists as to when she discovered she was damaged.

Here, it is undisputed that in April 1975, Mrs. Steele knew that neither her doctor nor the pharmacy, both of whom owed her a duty of care, had warned of the need to limit her intake of Wigraine, and that as a result she overdosed necessitating hospitalization. But Mrs. Steele argues the damage element of a cause of action against the defendants was missing until 1981, when she suffered the heart attack. We disagree.

A plaintiff must suffer actual and appreciable harm, as distinguished from nominal damages, before the statute

of limitation commences. *Gazija v. Nicholas Jerns Co.,* 86 Wn.2d 215, 219, 543 P.2d 338 (1975).

"Where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date."

*Lindquist v. Mullen,* 45 Wn.2d 675, 677, 277 P.2d 724 (1954) (quoting 34 Am. Jur. *Limitation of Actions* § 160, at 126), *overruled on other grounds in Ruth v. Dight,* 75 Wn.2d 660, 453 P.2d 631 (1969); *Gazija,* at 219; *Streifel v. Hansch,* 40 Wn. App. 233, 698 P.2d 570 (1985); *see also* 51 Am. Jur. 2d *Limitation of Actions* § 135 (1970). Generally, if the plaintiff is aware of some injury, the statute of limitation begins to run even if he does not know the full extent of his injuries. 2 J. Dooley, *Modern Tort Law* § 34.80, at 528 (rev. ed. 1983); *see also* 51 Am. Jur. 2d *Limitation of Actions* § 135, at 704 (1970). Thus, where plaintiff fell from defendant's defective ladder and was hurt but did not have to quit work as disabled until 1½ years later, the court held that the statute of limitation ran from the plaintiff's fall, "[e]ven though the full extent of [his] damage or loss [was] not . . . immediately ascertainable". *Christian v. Daniell Battery Mfg. Co.,* 279 So. 2d 214, 216 (La. Ct. App. 1973) (quoting *Lucas v. Commercial Union Ins. Co.,* 198 So. 2d 560, 563–64 (La. Ct. App. 1967)); *see also Caudill v. Arnett,* 481 S.W.2d 668 (Ky. 1972) (the statute of limitation commenced when the plaintiff was injured in a bus accident, not when he discovered 6½ years later when exploratory surgery was performed that he was suffering from chronic pancreatitis as a result of the earlier injury).

The rule recognizes that "accrual of an action should not depend upon a technical breach of duty . . . but upon the existence of a practical remedy." *Haslund v. Seattle,* 86

Wn.2d 607, 620, 547 P.2d 1221 (1976). C. McCormick, *Damages* § 20, at 85 (1935), defines nominal damages as

damages awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage, . . .

C. McCormick, § 21, at 87, contrasts nominal damages, which are "usually fixed at some trivial amount" with small compensatory damages, "which are measured by the loss actually suffered".

One court has stated the distinction as follows:

"It is clear that mere possibility, or even probability, that an event causing damage will result from a wrongful act does not render the act actionable. Of course, it is uncertainty as to the *fact* of damage, rather than its *amount,* which negatives the existence of a cause of action. . . ."

(Italics ours.) *Davies v. Krasna,* 14 Cal. 3d 502, 513, 535 P.2d 1161, 121 Cal. Rptr. 705, 713, 79 A.L.R.3d 807 (1975) (quoting *Walker v. Pacific Indem. Co.,* 183 Cal. App. 2d 513, 6 Cal. Rptr. 924 (1960)). Moreover, "neither the speculative nor uncertain character of damages nor the difficulty of proof will toll the period of limitation." *Davies,* at 514.

Although Mrs. Steele may have considered the *amount* of her damages small in 1975, nevertheless, it is uncontroverted she was aware of some injury. Early on, she had suffered actual and appreciable damages resulting from the drug overdose, *i.e.,* she experienced loss of sensation in her arms and legs and required hospital care. Thus, the trial court was correct when it determined Mrs. Steele knew all of the elements of a cause of action in 1975.

In her second contention Mrs. Steele argues the 1981 heart attack and 1982 stroke are separate and distinct injuries from the 1973 injury. She maintains that a separate cause of action exists for the latter injuries and that this cause did not accrue until the injuries became manifest in 1981–82. Hence, she reasons the statute of limitation for that cause of action had not run so as to bar this action. We find, however, the rationale rejecting the previous issue applies to this argument, as well.

Moreover, we find persuasive the reasoning in *Guiley v Hammaker,* 55 Or. App. 921, 640 P.2d 664 (1982), which distinguishes occupational disease cases cited by counsel for Mrs. Steele. There, the plaintiff sought recovery 7 years after he incurred a head abrasion in an auto accident. He argued the statute of limitation did not bar his action because it was not until then that he discovered that the accident had also caused damage to an optic nerve. The plaintiff cited an occupational disease case for the proposition that responsibility for bringing an action awaits a plaintiff's association of his symptoms with a serious or permanent condition. However, the court held in *Guiley,* at 926:

> Occupational diseases arise out of a course of events, not out of a discrete act; it is the development and awareness of the disease, not some symptomatology, which is crucial.
>
> . . .
> . . . We would be abrogating the policy of the statute of limitations if we were to hold that a plaintiff with notice of both an injury and its cause would be excused from bringing an action until he had determined the *full extent* of the consequences of the wrong done him.

(Citations omitted.)

For these same reasons we find occupational disease cases and their supporting rationale distinguishable from Mrs. Steele's case. To hold otherwise would constitute a departure from long established law in the state and would effectively destroy application of statutes of limitation. We uphold the trial court's determination that Mrs. Steele was aware of all the elements of her cause of action by April 1975, if not before.

Affirmed.

GREEN, C.J., concurs.

McINTURFF, J.—I dissent. An issue of material fact exists as to whether Mrs. Steele's later manifested injuries were distinct from, or merely a maturation of, her earlier injuries

which are clearly time barred. If the later injuries are separate and distinct, then a separate and distinct cause of action accrued for them when Mrs. Steele discovered them.

The majority relies on the general rule that if a plaintiff is aware of some injury, the statute of limitation begins to run even if he does not know the full extent of his injuries. J. Dooley, *Modern Tort Law* § 34.80, at 528 (rev. ed. 1983); *see also* 51 Am. Jur. 2d *Limitation of Actions* § 135, at 704 (1970). However, a different rule has evolved in cases involving a latent injury or disease which is separate and distinct from an earlier manifested injury or disease. In several asbestos cases, the courts have rejected the argument that a plaintiff's cause of action for damages for an asbestos–caused latent cancer is barred by the statute of limitation because his claim accrued when he first knew or should have known he was suffering from *any* asbestos–related disease, in most instances, asbestosis. *See Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 120 (D.C. Cir. 1982); *Fearson v. Johns–Manville Sales Corp.,* 525 F. Supp. 671, 674 (D.D.C. 1981).

The court in *Wilson,* at page 119, noted that of the considerations served by statutes of limitation, the interest in repose of claims would be furthered by adopting a broad definition of cause of action. But,

> in situations involving the risk of manifestation of a latent disease . . . the evidentiary consideration counsels narrower delineation of the dimensions of a claim. Key issues to be litigated in a latent disease case are the existence of the disease, its proximate cause, and the resultant damage. Evidence relating to these issues tends to develop, rather than disappear, as time passes.

The court also was influenced by its concern that the plaintiff receive fair compensation for serious harm, and its interest in deterring uneconomical anticipatory lawsuits. *Wilson,* at 120.

According to the *Fearson* court at page 674, plaintiff's affidavits made clear that the cancer and the earlier disease, asbestosis, were completely separate and distinct. It rea-

soned:

> Under defendants' theory, plaintiffs would be forced to come into Court as soon as any minimal problem is diagnosed and seek speculative damages as to any other injuries that might develop in the future. Plain common sense teaches that the law was never meant to be so unreasonable.

The court then cited the following hypothetical:

> The plaintiff's illustration of this point by way of a hypothetical clarifies this reasoning. Suppose an individual takes a drug which causes a skin rash which disappears in a few days and no legal action is brought because of the minimal harm caused. Years later, the individual discovers that he or she has cancer which resulted from use of the same product. Under the defendants' theory, the failure to sue for the skin rash would bar the suit for cancer. This exceeds the bounds of common sense as well as sound legal reasoning.

*Fearson,* at 674 n.4.

In another asbestos case, *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 662, 464 A.2d 1020, 1024 (1983), the court also noted the plaintiff's affidavit which presented expert medical testimony that there is no known link between the development of asbestosis and the development of lung cancer and that lung cancer is not a maturation of asbestosis. Hence, a plaintiff who seeks damages based on asbestosis is not permitted to put on proof concerning the degree of likelihood that cancer will ensue. *Pierce,* 464 A.2d at 1026–27. As a corollary, the plaintiff's action, if cancer develops, should not be barred by a statute of limitation commencing on discovery of asbestosis. *Pierce.*

In *Place v. Ortho Pharmaceutical Corp.,* 595 F. Supp. 1009 (W.D. Pa. 1984), the court applied the analysis of *Pierce* in a product liability case arising out of the plaintiff's use of an intrauterine device (IUD). There, the plaintiff experienced flu–like symptoms in late 1977. A doctor's examination revealed that the IUD had punctured the wall of the vagina. The IUD was removed, and the plaintiff underwent surgery for the opening and draining of a tubo-

varian abscess. *Place,* at 1011. She recovered from her symptoms, only to develop new symptoms 2 years later. The diagnosis for these symptoms included chronic hepatitis and chronic colocystitis. *Place,* at 1012. The court noted that the record was devoid of any evidence linking the two episodes to the same chain of causation. In holding the plaintiff had alleged separate and distinct causes of action and that suit on the second illness was not barred by the statute of limitation, the court reasoned:

> While both diseases may be attributable to the same exposure, they are separate and distinct. There is nothing here to show that the second disease could be a reasonably certain consequence of the first such as to allow damages for future consequences in a timely suit for the first injury, or in the alternative to deny recovery on the second illness because of an award in a suit on the first illness.

*Place,* at 1012.

As in the occupational disease cases, Mrs. Steele's damages are attributed to exposure to a dangerous substance over a period of time. In her case, the exposure led to some immediately apparent problems and, allegedly, to some other problems which did not manifest themselves until much later. The material issue is whether Mrs. Steele's 1981–82 heart attack and stroke were distinct from or simply a maturation of the condition which resulted in loss of sensation in her arms and legs in 1973. Thus, Mrs. Steele should be given an opportunity to litigate this issue.

Secondly, nothing in the record links the 1981–82 problem with the symptoms she had in 1973. Since the defendants bear the burden of proving their affirmative defense, *i.e.,* that the statute of limitation bars Mrs. Steele's action, this lack of evidence necessitates reversal of the Superior Court's summary judgment dismissing her claim.

Reconsideration denied April 25, 1986.

Review denied by Supreme Court July 8, 1986.