[No. 14056-6-I. Division One. June 23, 1986.]

DONNA J. WEISERT, ET AL, *Appellants,* v. UNIVERSITY HOSPITAL, ET AL, *Respondents.*

---

*J. Donald Curran* and *Delay, Curran, Thompson & Pontarolo, P.S.*, for appellants.

*Frank W. Draper* and *Lane, Powell, Moss & Miller*, for respondents.

REVELLE, J.*—Wallace and Donna Weisert allege that the trial court erred in granting summary judgment to University Hospital and the other defendants. They contend the trial court erred in determining that pursuant to RCW 4.16.350 they did not timely file this malpractice action within 1 year of discovering all of the essential elements of their cause of action. We reverse and remand.

On November 8, 1972, Mrs. Weisert, then age 26, underwent heart surgery to replace her mitral valve. The surgery was done at University Hospital in Seattle. During the surgery, the doctors inserted a catheter to monitor the atrium pressure and draw blood gas samples. When one of the doctors went to remove the catheter, he inadvertently left a 14–centimeter portion in Mrs. Weisert's atrium. Between 1972 and 1979 Mrs. Weisert suffered eight or nine strokes.

On November 23, 1979, Dr. Ralph Berg, Jr., operated on Mrs. Weisert at Deaconess Hospital in Spokane to replace the mitral valve prosthesis inserted in the 1972 operation and also to replace the aortic valve. During the surgery Dr. Berg noticed a clot in Mrs. Weisert's left atrium where the tip of the catheter inserted during the 1972 surgery touched

---

*Judge George H. Revelle is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

the atrium's back wall. Dr. Berg removed the catheter.

It is not clear from her deposition just how much Dr. Berg told her after the operation, and at what point he gave her information.[1] In an affidavit, Dr. Berg stated that he

---

[1]Mrs. Weisert testified to the following at her deposition:

Q. . . . What information did Dr. Berg give to you concerning what he felt should have been done with the tube that was found in your body at that latter surgery?

A. He was very disagreeable about it.

Q. Who did he disagree with?

A. With the doctor that left it in.

Q. Did he relate to you what, if any, damage that he felt that that tube had caused to you?

A. He didn't have to, because I could feel the damage that it had done.

Q. What damage did you feel had been caused by that tube remaining in you?

A. After about eight or nine strokes you—the ninth stroke was a bad one.

. . .

Q. At the time Dr. Berg after the surgery told you that he had found a tube in your body, did you feel that that tube had caused in some way your strokes?

A. (No response.)

Q. At the time of that discussion, did you feel that your strokes had resulted in some way from that tube being left in your body in 1972?

A. I don't know how to answer that.

Q. As best you can; yes, no, or wasn't sure?

MR. CURRAN: What's the connection in your mind between that tube in your body and your strokes?

A. That was the reason I had the strokes.

Q. (BY MR. KRAFT) And when did you first determine that that was the reason you had the strokes?

A. I believe the doctor told me that that was the reason for the strokes.

Q. And was this during the first discussion you had after your operation in November of '79?

A. I am not sure.

Q. Was it soon after that operation?

A. It was soon after; I don't remember when though.

Q. Was it within a month after that operation?

A. Yes.

Q. Was it within a week after the operation?

A. I don't know.

Q. Not to belabor the point, was it within two weeks after the operation?

A. I don't know that either.

Q. Three weeks?

A. (Witness gestures with her hands.)

Mrs. Weisert then testified to the following:

Q. At the time that Dr. Berg told you that, in his opinion, the strokes had

has never discussed with Mrs. Weisert any possible negligence by the doctor who left the catheter in her body in 1972 or the causal relationship between the catheter and her strokes.

On January 18, 1980, the Weiserts consulted I. James Heckathorn, an attorney in Montana near their home, about the possibility of filing a claim pertaining to the 1972 surgery. At that time, the Weiserts knew about the catheter, the blood clots, and the strokes, but as far as Heckathorn knew, there had been no expression of medical

---

resulted from the tube remaining in your body, did he tell you that the doctors from the University of Washington who operated on you in 1972 had done something that would be considered outside the normal medical accepted standards in leaving that tube in your body?

A. Yes.

MR. CURRAN: Would you read back that question, please? Now, please, listen very closely to this question.

(Question read.)

THE WITNESS: That is a tongue twister, isn't it?

MR. CURRAN: What do you think that question means?

THE WITNESS: It sounds like it means that the doctors in Seattle shouldn't have left it there.

Q. (BY MR. KRAFT) What the question is, at the time you had your conversation with Dr. Berg concerning what he found, did he tell you that the doctors shouldn't have left it there?

A. You got me all befuddled on that one.

Q. Well, are you claiming in this lawsuit that in leaving the tube in your body after the 1972 operation, that the doctors at the University of Washington Hospital did something wrong?

A. In my opinion, yes.

Q. When did you first form that opinion?

A. Several months after I had my last surgery.

Q. And on what did you base that opinion?

A. With all the trouble that I had with that first surgery.

Q. Did anything that Dr. Berg told you subsequent to your November, '79 surgery help form the basis for your opinion?

A. Not really. ˙

. . .

Q. (BY MR. KRAFT) I take it, Mrs. Weisert, that any wrongdoing that you may complain of with regard to any allegations you make against the University of Washington for an alleged failure to inform you of information, whatever information, that you learned of or became aware of such failure to inform or alleged failure to inform prior to your discharge from Deaconess in January of 1980?

A. Yes.

opinion that there was a causal relationship between the three. He stated that the thrust of his inquiry would be whether the catheter caused the clots and the clots caused the strokes, and he communicated this to the Weiserts.

Heckathorn was not accomplishing anything on the case and so on March 6, 1981, he contacted the office of J. Donald Curran, a Spokane attorney, to refer him the case or to associate with him on it. On March 12, 1981, Heckathorn wrote Curran a letter in this regard. Included in this letter was the statement that apparently it was the broken catheter "which caused blood clots which in turn caused the strokes."

On March 20, 1981, the Weiserts and Heckathorn held a telephone conference with Curran. Heckathorn states that this is when he first became aware that the Weiserts knew of the causal relationship between the catheter and Mrs. Weisert's strokes.

On May 14, 1981, Curran wrote to Dr. Berg, requesting that the doctor review Mrs. Weisert's 1972 hospital records and express his opinion whether the catheter caused Mrs. Weisert's strokes and whether the related medical care was substandard. Dr. Berg did not confer with Curran until August 18, 1981, when he spoke to him over the phone. Dr. Berg informed Curran that the catheter should have been removed, that the failure to do so violated the standard of care existing in 1972, and that the location of the catheter in Mrs. Weisert's left atrium caused her strokes.

On March 1, 1982, the Weiserts filed a complaint for medical negligence. On September 29, 1983, University Hospital and the other defendants filed motions for summary judgment, contending Mrs. Weisert knew of all the essential elements of her cause of action more than 1 year prior to filing the complaint, and thus the 1971 version of RCW 4.16.350 barred her action. The court granted the motion, dismissing the Weiserts' complaint.

Under CR 56(c), a motion for summary judgment involving the application of a statute of limitation should be granted where there is no genuine issue of material fact

as to when the plaintiff discovered the facts giving rise to the cause of action. *Buxton v. Perry,* 32 Wn. App. 211, 214, 646 P.2d 779 (1982). The moving party is entitled to judgment as a matter of law only if the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact. The court must consider all of the facts submitted and reasonable inferences therefrom in the light most favorable to the nonmoving party. The court should grant the motion only if, from all of the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Hostetler v. Ward,* 41 Wn. App. 343, 346, 704 P.2d 1193 (1985). Where different inferences may be drawn from evidentiary facts as to ultimate facts such as knowledge, summary judgment is not warranted. *Aduddell v. Johns–Manville Corp.,* 42 Wn. App. 204, 207, 709 P.2d 822 (1985). In reviewing the trial court's decision, this court engages in the same inquiry as did the trial court. *Wilson,* at 437.

 In interpreting the 1971 version of RCW 4.16.350,[2] the courts hold that the plaintiff's claim does not accrue until the plaintiff actually discovers all of the essential elements of the possible cause of action, *i.e.,* duty, breach of duty, causation and damages. *Wood v. Gibbons,* 38 Wn. App. 343, 347, 685 P.2d 619 (1984); *Teeter v. Lawson,* 25

---

[2]Laws of 1971, ch. 80, § 1, p. 194 (RCW 4.16.350) provides:

"Any civil action for damages against a hospital which is licensed by the state of Washington or against the personnel of any hospital, or against a member of the healing arts including, but not limited to, a physician licensed under chapter 18.71 RCW or chapter 18.57 RCW, chiropractor licensed under RCW 18.25, a dentist licensed under chapter 18.32 RCW, or a nurse licensed under chapter 18.88 or 18.78 RCW, based upon alleged professional negligence shall be commenced within (1) three years from the date of the alleged wrongful act, or (2) one year from the time that plaintiff discovers the injury or condition was caused by the wrongful act, whichever period of time expires last."

It is the 1971 version of RCW 4.16.350 which applies to this case because the alleged negligence occurred on or before June 25, 1976. RCW 4.16.350 was amended by Laws of 1975, 2d Ex. Sess., ch. 56, § 1.

Wn. App. 560, 610 P.2d 925 (1980).[3] It is from this point of discovery that the statute of limitation begins to run.

It is when the Weiserts first discovered the elements of duty, breach of duty, and causation which are in question. There was evidence that very soon after the operation in November 1979, Mrs. Weisert knew that the catheter caused her strokes and that leaving the catheter in her heart constituted a breach of duty by the doctors at University Hospital. There was also evidence that Mrs. Weisert did not believe there was a breach of duty until several months after the operation. Other evidence indicates that it was not until August 18, 1981, that the Weiserts were informed of a breach of duty. A letter written March 12, 1981, from Heckathorn to Curran states that the catheter apparently caused the strokes. However, Heckathorn believes it was not until March 20, 1981, that the Weiserts knew of the causal relationship. The Weiserts filed their action on March 1, 1982. These conflicts in the evidence illustrate that the formalities of a trial are necessary before the facts can be reliably determined. Reasonable persons could differ as to when the Weiserts discovered all of the essential elements of their cause of action. Therefore a genuine issue of material fact exists as to whether they timely filed their lawsuit. The trial court erred in granting the motion for summary judgment.

We reverse and remand for trial.

SWANSON and WILLIAMS, JJ., concur.

Review denied by Supreme Court October 7, 1986.

---

[3]*Compare Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 511, 598 P.2d 1358 (1979), which holds that the plaintiff's cause of action does not accrue until he or she discovers or reasonably should discover all of the essential elements of the possible cause of action. In dictum, *Steele v. Organon, Inc.,* 43 Wn. App. 230, 233, 716 P.2d 920 (1986) follows *Ohler.*