624 S.E.2d 562

**John Edward GOODWIN, Plaintiff Below, Appellant**

v.

**BAYER CORPORATION, et al., Defendants Below, Appellees.**

**No. 32654.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 2005.

Decided Dec. 1, 2005.

Dissenting Opinion of Justice Starcher Dec. 16, 2005.

---

Vincent Trivelli, Esq., Stuart Calwell, Esq., The Calwell Practice, PLLC, Charleston, for Appellant.

April Morgan Hincy, Esq., Timothy S. Coon, Esq., Eckert Seamans Cherin & Mellott, PLLC, Pittsburgh, PA, for Appellee Bayer Corp.

Melvin F. O'Brien, Esq., Christopher D. Stofko, Esq., James R. Miller, Esq., Dickie, McCamey & Chilcote, Pittsburgh, PA, for Appellee PPG Industries, Inc., the Sherwin–Williams Company.

Thomas V. Flaherty, Esq., Tammy R. Harvey, Esq., Flaherty, Sensabaugh & Bonasso, Charleston, for Appellee Rust–Oleum.

James S. Crockett, Jr., Esq., Beth A. Rauer, Esq., Spilman Thomas & Battle, PLLC, Charleston, for Appellee E.I. DuPont de Nemours and Company.

Melvin F. O'Brien, Esq., Randall L. Trautwein, Esq., Lamp, O'Dell, Bartram, Levy & Trautwein, PLLC, Huntington, for Appellee Refinishing Material Specialties, Inc.

PER CURIAM.

This case is before the Court on appeal from the August 25, 2004, Order of the Circuit Court of Kanawha County granting summary judgment in favor of the Appellees and finding that there was no genuine issue of material fact as to whether Appellant had filed the underlying action outside of the period allowed by the statute of limitations. Finding that Appellant had filed his complaint outside of the period allowed by the statute of limitations, the court dismissed the complaint with prejudice.

This Court has before it the petition for appeal, the response, the briefs of the parties, and all matters of record. Following the arguments of the parties and a review of the record herein, this Court finds that existing case law supports the position of Appellees over that of Appellant. Accordingly, this Court affirms the August 25, 2004, Order of the circuit court granting summary judgment in favor of Appellees.

I.

FACTS

Between 1969 and 1991, Appellant Goodwin worked at various businesses-including that of his father-as an auto body and trim painter, a foreman, a welder, and a "body man." For the last four to five years of his working life and after his father's retirement, Goodwin ran the family business until its close in 1991.[1] Goodwin never worked again in any capacity because he "just didn't want to work."

Beginning in 1988, three years before the closure of his business, Goodwin noted a funny taste in his mouth as well as tightness in his chest and trouble breathing while painting. At some point in or around that same time, Goodwin purchased and "religiously" used an air-supplied respirator, which seemed to remedy his symptoms. In 1997, six years after Goodwin himself stopped painting, Goodwin was again exposed to paint while watching his son-in-law and a friend paint a bus outside of Goodwin's former shop. Goodwin was not wearing a respirator at the time and began to again experience shortness of breath and chest pains.

On June 3, 1997, Goodwin went to see his family physician, Dr. Victor Selvaraj, in regard to his difficulty in breathing. At that time, Dr. Selvaraj noted in his medical records that Goodwin "has been painting caus-

---

1. The business did not close for any medical reasons related to Goodwin.

ing breathing problems." Dr. Selvaraj diagnosed Goodwin with chronic obstructive pulmonary disease and referred Goodwin for further tests. Those respiratory function tests revealed that Goodwin suffered from asthma but did not otherwise distinguish that Goodwin's asthma was associated with his work with auto body paint products. Nonetheless, Goodwin, according to his own testimony, associated his breathing problems with exposure to paint. In his March 22, 2004 deposition, Goodwin's testimony was as follows:

Q: When did you first start thinking that the breathing problems you were having were related to paint exposure?

A: When I went to the doctor in '97.

Q: To Dr. Selvaraj?

A: Yes.

Q: Did Dr. Selvaraj tell you that he thought that your breathing problems were related to paint exposure?

A: No.

Q: Then why did you make that connection in '97?

A: I told him that I had been in paint, and he didn't say anything. He just started treating me for breathing.

Q: But you felt it was related to paint?

A: Me?

Q: Yes.

A: Yeah, I thought it was.

Q: Did Dr. Selvaraj tell you that he thought it was related to paint?

A: No, not really.

Q: Has any doctor told you they thought your breathing problems were related to paint exposure?

A: No.

Q: Why do you believe your breathing problems are related to paint exposure?

A: Because I got—like four or five times before that, I'd had that problem and

it went away. This time it didn't go away. It never left.

He went on later in that same deposition to explain that his belief that his breathing problems were caused by paint began as early as 1988:

Q: At any time in those last three or four years when you were operating your garage, if you had an over-all paint job, you had breathing problems, correct?

A: If I did one, yes.

Q: And you believed it was the paint that was causing those problems; is that right?

A: Uh-huh.

Q: Is that a yes?

A: Yes. Yes.

Nonetheless, subsequent examinations of Goodwin by Dr. Selvaraj in March and August of 1998 again showed test results within normal limits.

In or around 1998, Goodwin contacted the Law Offices of Stuart Calwell (now The Calwell Practice) in regard to an advertisement the law firm was running seeking clients who worked around paint and who had experienced breathing problems. On or about April 21, 1998, the Law Offices of Stuart Calwell filed an application before the Social Security Administration on Goodwin's behalf seeking supplemental security income benefits based on a history of hernias and asthma, which was subsequently denied.[2] On June 14, 1999, acting on a release prepared by the Law Offices of Stuart Calwell, Dr. Selvaraj forwarded Goodwin's medical records to Calwell's office. Those medical records included Dr. Selvaraj's diagnosis and his note that Goodwin had "been painting causing breathing problems."

Goodwin's attorneys referred him to Dr. Roger A. Abrahams, who on November 8, 1999, submitted a letter to the Law Offices of Stuart Calwell expressing his belief that

---

2. The Social Security Administration decision referenced a report regarding a September 24, 1998, examination of Goodwin by Dr. Nilima Bhirud, which was apparently not made a part of this record. According to the Social Security Administration decision, Dr. Bhirud noted that Goodwin began having breathing problems two years earlier and that he had been diagnosed with asthma attributable to exposure to paint chemicals.

Goodwin suffered from "occupational asthma as a result of exposure to isocyanate-containing paint during his employment in the auto body repair business." [3] Distinguishing the medical histories of Dr. Selvaraj and his own admitted beliefs about the relationship between paint exposure and his breathing problems, Goodwin asserts that Dr. Abrahams was the first doctor to actually diagnose Goodwin with "occupational" asthma related to his work with paint.[4]

Thereafter, on October 22, 2001, the Law Offices of Stuart Calwell filed a complaint on behalf of Goodwin alleging negligence on the part of the manufacturing defendants, failure to warn on the part of the manufacturing defendants, breach of warranty on the part of the manufacturing defendants, strict liability of the manufacturing defendants, and conspiracy on the part of certain manufacturing defendants.[5] Goodwin's complaint sought both compensatory and punitive damages.

On April 27, 2004, the defendants jointly moved for summary judgment, alleging that Goodwin's complaint was filed outside the period of time allowed by the statute of limitations. The defendants argued that Goodwin's action was filed (a) over four years after he had first informed his family doctor of his breathing problems and his own belief about the cause of his breathing problems, and (b) two years and four months after Goodwin sought and engaged lawyers with an advertised expertise in paint exposure cases and had his medical records delivered to them. Goodwin responded that he could not have known nor reasonably should have known about his paint-related condition until his diagnosis by Dr. Abrahams in November 1999. Goodwin also raised the issue of claimed neuropsychological damage from the exposures he had to paint of which he was unaware until 2003.[6]

The circuit court conducted a hearing on the motion for summary judgment on July 16, 2004, following which the court granted judgment in favor of the defendant. The circuit court found that Goodwin knew or should have known (a) that he was injured, (b) who made the products which injured him, and (c) the causal relationship between those products and his injury "well before October 22, 1999." Therefore, the court found that Goodwin's complaint was filed outside of the statute of limitations. Goodwin appeals the court's order granting summary judgment.

II.

STANDARD OF REVIEW

■ This Court has held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Summary judgment should be granted only if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." West Virginia Rules of Civil Procedure, Rule 56(c). To that end, this Court has held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963); Syl. Pt. 1, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). "If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1)

---

3. It is interesting to note that the November 8, 1999, letter appears to rely on the results of tests purportedly performed on November 9, 1999, and December 6, 1999.

4. See, also, note 2.

5. The complaint also listed White Dodge as a defendant. White Dodge was later dismissed from the suit on April 10, 2002.

6. Goodwin's complaint does not directly allege neuropsychological damage. The closest allegation of such an injury was the allegation of "[p]hysical and mental pain and suffering." Otherwise, the complaint is focused on Goodwin's claims of occupational asthma. The first apparent mention of neuropsychological damage arose in Goodwin's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on July 9, 2004.

rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure." *Williams* at Syl. Pt. 3. With that standard in mind, we turn now to a discussion of the facts as they apply to the law in this case.

## III.

## DISCUSSION

■ Here, the issue at the heart of the motion for summary judgment was whether Goodwin filed his complaint outside the time allowed by the statute of limitations. Goodwin cites *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 714–715 487 S.E.2d 901, 909–910 (1997), to argue that "[i]n a great majority of cases, the issue of whether a claim is barred by the statute of limitations is a question of fact for the jury," not an issue which should be disposed of on summary judgment. Goodwin further draws on Syllabus Point 3 of *Stemple v. Dobson*, 184 W.Va. 317, 400 S.E.2d 561 (1990), in which this Court stated:

> Where a cause of action is based upon tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury.

However, the defendants point out that this Court has, on more than one occasion, affirmed summary judgment in cases where the undisputed facts establish that the suit was time-barred pursuant to the applicable statute of limitations. See e.g., *Jones v. Aburahma*, 215 W.Va. 521, 600 S.E.2d 233 (2004); *Thompson v. Branches–Domestic Violence Shelter of Huntington*, 207 W.Va. 479, 534 S.E.2d 33 (2000); *Stephens v. West Virginia College of Graduate Studies*, 203 W.Va. 81, 506 S.E.2d 336 (1998); *Vorholt v. One Valley Bank*, 201 W.Va. 480, 498 S.E.2d 241 (1997). This Court agrees with the defendants and with the Court's earlier decisions that summary judgment can and should be granted on the basis of an applicable statute of limitations when no genuine issue of material fact exists as to whether the statute of limitations has been violated. Here, the material facts are not in general dispute. Thus, where, as here, the issue is one of law, a consideration of summary judgment is appropriate.

■ The statute of limitations applicable to this particular case is set forth in West Virginia Code § 55–2–12, which states that "[e]very personal action for which no limitation is otherwise prescribed shall be brought…within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries." Certainly, there are instances when the tolling of the statute of limitations becomes a question of fact, such as when a plaintiff may not be aware of his or her injury or may not be aware of the cause of a known injury. Accordingly, this Court developed the so-called "discovery rule," which is illustrated in Syllabus Point 4 of *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997), wherein we held that "[i]n tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury." More particularly, "[i]n products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his injury." Syl. Pt. 1, *Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987); Syl. Pt. 1, *Cecil v. Airco, Inc.*, 187 W.Va. 190, 416 S.E.2d 728 (1992).

Here, Goodwin's testimony provides an unrebutted record of when Goodwin first believed he had been injured and what had

caused him this harm.[7] Goodwin, however, argues that he should not be considered to be aware of his injury ("occupational asthma") until November 8, 1999, when he received a report of his diagnosis from Dr. Abrahams. The defendants, however, argue that Goodwin was aware of his injury at least as early as 1997, and that fact is established by his testimony and the treatment he first sought from Dr. Selvaraj.[8] Goodwin's contentions are not persuasive in view of the facts in this case and our prior decisions. His own testimony leaves nothing to question. Goodwin testified that by 1997 he knew he had been injured by his exposure to paint. Furthermore, all of his actions confirm that conclusion.

Goodwin would have this Court determine that the statute of limitations did not begin to run until Dr. Abrahams made a diagnosis of occupational asthma in November 1999. However, Goodwin himself acknowledged in his deposition testimony that he believed all along, and at least by 1997, that his breathing problems were attributable to his use of isocyanate-containing paint products manufactured by the defendants. This Court has repeatedly stated that the statute of limitations begins to run when a plaintiff has knowledge of the fact that something is wrong and not when he or she knows of the *particular nature* of the injury. See, *Harrison v. Seltzer*, 165 W.Va. 366, 371, 268 S.E.2d 312, 315 (1980); *Gaither v. City Hosp., Inc.*, 199 W.Va. 706, 712, 487 S.E.2d 901, 907 (1997); *McCoy v. Miller*, 213 W.Va. 161, 166, 578 S.E.2d 355, 360 (2003). Goodwin's argument that we should depart from this bedrock precedent is unpersuasive.

■ The record conclusively reveals that long before the diagnosis of occupational asthma (based upon a 1999 medical referral by his attorneys), Goodwin believed that inhaled paint fumes caused him serious pulmonary problems, shortness of breath, and tightness in his chest. One such example of

an exposure associated with symptoms was the incident in 1997 when Goodwin watched his son-in-law paint a bus. "Where a plaintiff knows of his injury, and the facts surrounding that injury place him on notice of the possible breach of a duty of care, that plaintiff has an affirmative duty to further and fully investigate the facts surrounding that potential breach." *McCoy v. Miller*, 213 W.Va. 161, 165, 578 S.E.2d 355, 360 (2003)(citing *Harrison v. Davis*, 197 W.Va. 651, 478 S.E.2d 104 (1996)). In fact, the record reveals that Goodwin did indeed take affirmative action to investigate his breathing problems.

Goodwin related breathing problems to painting as early as 1988. He contacted his family doctor on June 3, 1997, with specific complaints which he related to painting. In 1998, Goodwin sought out the legal services of the Law Offices of Stuart Calwell because the firm advertised for clients who had experienced breathing problems due to exposure to paint. By June of 1999, Goodwin's attorneys had received the pertinent medical records from Dr. Selvaraj, which noted that Goodwin had "been painting causing breathing problems." Five months later, the office apparently received Dr. Abrahams' report diagnosing Goodwin with occupational asthma. It was yet another 23 months, however, before Goodwin would file suit.

In the end, consideration of the discovery rule based upon the unrebuttable record herein leads the Court to agree with the circuit court that the underlying action was filed well over two years after Goodwin first knew that he suffered a breathing problem caused by his use of isocyanate-containing paints. While it is unclear to us why there was such a significant delay in the filing of the underlying action, it is clear that the discovery rule was never intended to excuse such a delay, nor will this Court allow the discovery rule to be modified, manipulated or expanded to now be used to remedy such a

---

7. No issue has been raised as to whether or when Goodwin became aware of who produced the paints which caused his injury.

8. Again, it is unclear if Dr. Bhirud's report, which was apparently attached to Goodwin's failed attempts to obtain Social Security Disability Benefits in 1998, was made a part of the record in the circuit court proceeding. If it was, Dr. Bhirud's reported history of a diagnosis of asthma attributable to paint exposure would add further support to defendants' position.

delay. Accordingly, we agree that Goodwin's complaint was filed ·beyond the applicable statute of limitations.

■ In a further attempt to avoid the effect of the statute of limitations herein, Goodwin also now complains of a separate neuropsychological injury caused by the same exposures to paint fumes that caused his breathing problems. Goodwin asserts that he was absolutely unaware of such an injury until it was diagnosed by Dr. Steven F. Dreyer, a psychologist, in 2003. Goodwin claims that the neuropsychological injury was caused not by isocyanates contained in the paint, but by solvents contained in the paint. Goodwin argues that this injury is a separate and distinct injury caused by a separate and distinct product component. He does not claim that a separate exposure caused this injury. Because the neuropsychological injury was not diagnosed until 2003, Goodwin asserts that it should be ruled a viable claim as the statute of limitations had not yet run on the claim when the circuit court issued its decision.[9]

■ We disagree. The issue before us is when Goodwin knew that he had suffered harm from breathing paint fumes. There is simply no credible argument upon which Goodwin can rely to avoid the operation of the statute of limitations under these facts. Goodwin knew in 1997, and arguably earlier, that he had suffered some sort of injury due to his exposure to paints. On this record, it was Goodwin's duty to begin investigating the *full extent* of his injuries at that time. "Where a plaintiff sustains a noticeable personal injury from a traumatic event, the statute of limitations begins to run and is not tolled because there may also be a latent injury arising from the same traumatic event." Syl. Pt. 3, *Jones v. Trustees of Bethany College*, 177 W.Va. 168, 351 S.E.2d 183 (1986).

■ Goodwin asserts that he did not and could not have known about a latent neuropsychological injury until he read Dr. Dreyer's report in 2003, and, therefore, the discovery rule operates to save his claim. Such an argument fails under *Bethany College*. It is the recognition of harm from exposure to paint fumes herein which triggers the statute of limitations. In *Bethany College*, this Court acknowledged that other jurisdictions have clarified the "traumatic event/latent manifestation case" and its relationship to the statute of limitations, such as in the case of *Albertson v. T.J. Stevenson .& Co.*, 749 F.2d 223, 230 (5th Cir.1984):

> " 'The pure latent injury case ordinarily arises in one of three situations: a suit by a worker who contracts an occupational disease, a medical malpractice suit by a patient who discovers an injury long after the negligent medical treatment has been administered, or a product liability suit by a consumer of a drug or other medically related product who discovers a side effect from the use of the defendant's product. In each of the pure latent injury cases, the plaintiff fails to discover either the injury or its cause until long after the negligent act occurred.' " *Id.* at 170–171, [351 S.E.2d at] 185–186.

In such a case, the discovery rule is applicable. However, Goodwin's alleged neuropsychological injury cannot be called a "pure latent injury." And we stated in *Bethany College*:

> "[w]here there has been a noticeable injury caused by a traumatic event, the fact that there may be a latent component to the injury does not postpone the commencement of the statute of limitations according to a substantial majority of courts. *Brassard v. Boston & Me. R.R.*, 240 F.2d 138 (1st Cir.1957); *Ciccarone v. United States*, 486 F.2d 253 (3d Cir.1973); *Beech v. United States*, 345 F.2d 872 (5th Cir.1965); *Steele v. United States*, 599 F.2d 823 (7th

9. Goodwin also points out that the circuit court did not address the neuropsychological injury in its order granting summary judgment. However, as previously pointed out, Goodwin only raised the issue himself almost in passing and seemingly as an afterthought in the last page of his argument in his Memorandum of Law in Opposi-

tion to Defendants' Motion for Summary Judgment. Notably, Goodwin's complaint was never amended to include a separate and distinct claim for neuropsychological injuries caused by a separate and distinct component product within the paint to which he was exposed.

Cir.1979); *Fletcher v. Union Pac. R.R.*, 621 F.2d 902 (8th Cir.1980), cert. denied, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981); *McEntire v. Malloy*, 288 Ark. 582, 707 S.W.2d 773 (1986); *Carter v. Cross*, 373 So.2d 81 (Fla.App.1979); *Dowling v. Lester*, 74 Ga.App. 290, 39 S.E.2d 576 (1946); *Ralphs v. City of Spirit Lake*, 98 Idaho 225, 560 P.2d 1315 (1977); *Caudill v. Arnett*, 481 S.W.2d 668 (Ky.1972); *Christian v. Daniell Battery Manufacturing Co.*, 279 So.2d 214 (La.App.1973); *Guiley v. Hammaker*, 55 Or.App. 921, 640 P.2d 664 (1982); *Steele v. Organon, Inc.*, 43 Wash.App. 230, 716 P.2d 920 (1986); *Duke v. Housen*, 589 P.2d 334 (Wyo.), cert. denied, 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979); 51 Am.Jur.2d Limitations of Actions § 135 (1970)." *Id.* at 170, [351 S.E.2d at] 185.

Where, as here, a party subjectively relates an event or events (here, exposure to paint) to a noticeable harm or injury, *Bethany College* is controlling.

It isn't important whether or when Goodwin was aware of the full extent of injuries that might be manifested from the exposure(s). What is important is that Goodwin knew that he had been harmed as a result of an identified event or events (i.e., exposure(s) to paint fumes), and it was his duty thereafter to fully investigate the injuries that might follow that exposure. As we explained in *Bethany College*, "[w]ith the customary utilization of discovery and other pretrial procedures, considerable time can be consumed from the date the suit is filed and before it is ready for trial. This time period when coupled with the initial period of limitations should enable a plaintiff to learn of any latent injuries that have occurred from the initial traumatic event." *Id.* at 172, 351 S.E.2d at 187. Goodwin engaged counsel who advertised an expertise and experience in paint exposure claims. Waiting some five more years to consider potential neuropsychological harm under such circumstances is simply unreasonable.

## IV.

### CONCLUSION

Having determined that Goodwin's cause of action was filed outside of the period of time allowed by the statute of limitations, we find that there remains no issue of material fact to be determined through trial as to whether Goodwin's cause of action was filed in violation of the statute of limitations. Accordingly, this Court finds that it was not error for the Circuit Court of Kanawha County to enter an Order Granting Summary Judgment in favor of Appellees.

Affirmed.

STARCHER, J., dissenting.

(Filed Dec. 16, 2005)

In this case, the majority opinion rested its laurels on its conclusion that the material facts below were not in general dispute. But the mere premise that the facts are not in dispute in a case is insufficient grounds for a circuit court to grant summary judgment. Because the inferences that can be drawn from those facts are favorable to the appellant's case, summary judgment should have been denied by the circuit court.

It is black-letter law that when a party moves for summary judgment, the circuit court must view any permissible inference from the evidence in the light most favorable to the party opposing the motion. The summary judgment motion should be denied even where there is no dispute as to the evidentiary facts in the case, but only as to the conclusions to be drawn therefrom. As we stated in *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (W.Va. 1995):

> The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Consequently, we must draw any permissible inference from the underlying facts in the most favorable light to the party opposing the motion. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Summary judgment should be de-

nied even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.

(Citations and quotations omitted.)

In occupational lung disease cases like this one, the plaintiff files a lawsuit because of a specific lung injury that is sometimes now manifesting itself in shortness of breath. Defense lawyers inevitably ask the plaintiff a series of vague, nebulous questions along the lines of "do you have a breathing problem?" The next series of questions follow the path of "did you think those breathing problems might be caused by the defendant's product?" The plaintiff inevitably and eagerly responds "Yes!" to both series of questions.

The problem with the defense lawyer's questions is that they never specifically tie the plaintiff's "breathing problems" to the specific lung injury, because the plaintiff—when prodded—can usually list a dozen reasons that he thought, wondered or dreamed about in the decades leading up to his lawsuit that he speculated might be the cause of his "breathing problems." Any defense lawyer worth his/her salt can easily get the plaintiff to admit to "breathing problems" like coughing, choking, or sneezing upon inhaling the defendant's product. But you never see the defense lawyer get the plaintiff to also admit they coughed, choked or sneezed when they worked with flour while baking cookies, breathed cold winter air, or walked in a field of ragweed. The plaintiff who will eagerly say he was out of breath after walking through a cloud of the defendant's product will, if asked, sheepishly admit he is just as out of breath walking up a flight of stairs. The plaintiff who "thought" his problems were caused by the defendant's product might also go so far as to say that he's been thinking his shortness of breath is a result of old age, weight, some non-occupational disease like asthma, or smoking.

In other words, the defense lawyer's questions rarely reveal a knowledgeable, intelligent connection between the plaintiff's actual symptoms of an occupational disease (like shortness of breath) and the actual occupational injury. The defense lawyer is usually speculating about the existence and cause of the plaintiff's symptoms, and the plaintiff is speculating too. Nine times out of ten, the plaintiff is clueless about the existence of a lung injury until a doctor makes a formal diagnosis. Even after a formal diagnosis of a lung injury, the plaintiff is usually guessing that every ache and pain is a symptom connected to the injury. Moreover, the defense lawyer is just as clueless about the plaintiff's symptoms, and is also guessing in trying to make a connection between the plaintiff's vague knowledge of his "breathing problems" and the plaintiff's affirmative, intelligent knowledge of his lung injury.

In this case, the appellant admitted to having undefined "breathing problems" when he breathed in paint fumes. The circuit court could fairly infer, then, that the appellant reasonably knew he had some lung injury that was caused by inhaling the appellees' paint products. However, as the non-moving party, the circuit court should have focused on inferences favorable to the appellant, not the appellees. The circuit court should, therefore, have fairly inferred that the appellant—like any person—had no idea that he had a lung injury, but instead would cough, choke, sneeze, have shortness of breath or whatever when he breathed in paint fumes and, to avoid those problems, wore a respirator. The appellant's doctor never connected the appellant's progressive problems to the appellees' paint products, and the appellant was speculating about any connection. It was not until November 1999, less than two years before the appellant's lawsuit was filed, that a doctor actually informed the appellant he had a lung injury that was specifically tied to his occupational exposure to the appellees' paint products. But even that formal diagnosis never connected the appellant's "breathing problems" to the lung injury.

Simply put, I believe inferences can be drawn from the record that the appellant was clueless about the existence of his lung injury until November 1999, and clueless that his "breathing problems" were caused by the appellees. I would have permitted a jury to assess the appellant's story and determine when the appellant first reasonably knew or should have known of the existence of a cause of action against the appellees.

I therefore respectfully dissent.

I am authorized to state that Chief Justice ALBRIGHT joins in this opinion.