IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| EPIC, a non-profit corporation, | ) | |
| | ) | No. 34540-8-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLIFTONLARSONALLEN LLP, a | ) | PUBLISHED OPINION |
| limited liability partnership, and RALPH | ) | |
| CONNER, an individual, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, C.J. — Is an auditor engagement agreement provision, which imposes a deadline for filing suit, against the auditor, within two years from the date of the last audit report, a reasonable and enforceable stipulation when the auditor's client had one year to file suit after it should have discovered any breach of duty by the auditor and any resulting damages? Plaintiff Enterprise and Progress in the Community (EPIC) appeals from a summary judgment dismissal of its suit against its former auditing firm, CliftonLarsonAllen LLP (CLA), for negligence and breach of contract. We hold the contractual provision to be reasonable under the circumstances and affirm the trial court's dismissal of the suit.

## FACTS

Plaintiff EPIC, a nonprofit corporation, operates a Head Start program funded by

the United States Department of Health and Human Services Administration for Children and Families (HHS). Defendant CLA is the successor to EPIC's former auditing firms, Lemaster & Daniels PLLC and LarsonAllen LLP. This statement of facts will refer to all iterations of the auditing firm as CLA.

From 2006-2011, EPIC entered annual engagement agreements with CLA to audit EPIC's financial statements and determine whether EPIC complied with federal grant regulations. Each engagement agreement contained clauses that required EPIC to commence any legal action arising from the audits within two years. The limitations clause pertaining to the 2006-2009 audits stated:

> It is agreed by Client [EPIC] and [Lemaster & Daniels PLLC] [CLA] or any successors in interest that no claim arising out of services rendered pursuant to this agreement by or on behalf of Client shall be asserted more than two years after the date of the *last audit report* issued by [Lemaster & Daniels PLLC].

Clerk's Papers (CP) at 38, 44, 52, 57 (emphasis added). The limitation clauses in the 2010-2011 audit agreements declared:

> Time limitation
>
> The nature of our services makes it difficult, with the passage of time, to gather and present evidence that fully and fairly establishes the facts underlying any Dispute. We both agree that, notwithstanding any statute or law of limitations that might otherwise apply to a Dispute, any action or legal proceeding by you against us must be commenced within twenty-four (24) months ('Limitations Period') after the date when we deliver our *final audit report under this agreement*, regardless of whether we do other services for you relating to the audit report, or you shall be

2

> forever barred from commencing a lawsuit or obtaining any legal or equitable relief or recovery.
>     The Limitation Period applies and begins to run even if you have not suffered any damage or loss, or have not become aware of the existence or possible existence of a Dispute.

CP at 70, 79 (emphasis added). All engagement agreements defined "dispute" as "[a]ny disagreement, controversy, or claim that may arise out of any aspect of our services or relationship with you." CP at 70, 79.

Pursuant to the agreements, CLA delivered the following audit reports to EPIC on the following dates:

| | |
|---|---|
| 2006 audit report | May 22, 2007 |
| 2007 audit report | March 17, 2008 |
| 2008 audit report | June 29, 2009 |
| 2009 audit report | May 18, 2010 |
| 2010 audit report | March 28, 2011 |
| 2011 audit report | September 19, 2012 |
| 2012 audit report | June 25, 2013 |

CLA last prepared an audit for EPIC for the 2012 year. We do not know if EPIC's financial year was the same as the calendar year.

On January 17, 2012, HHS notified EPIC that EPIC violated federal regulations by using 2011 grant money to pay expenses for another year. The disbursements reported to HHS by EPIC for 2011 exceeded the disbursements reflected in EPIC's internal

3

accounting records. Under federal regulations, a Head Start recipient must expend grant money received on obligations incurred during the funding period to the award, rather than accumulate the money for later payments. Among other untimely payment of bills, EPIC, in January 2011, wrote a check to one vendor but did not deliver the check to the vendor until June because of a cash flow problem. The notification directed EPIC to correct its violation of the HHS regulation within ninety days or such additional time, up to one year, as approved by an HHS official.

Shortly after receiving HHS's notice EPIC confirmed that Walter Abegglen, EPIC's chief financial officer, used grant funds from one grant year to pay expenses incurred in a different grant year. EPIC contends that Abegglen lacked knowledge that the delayed expenditures breached HHS rules. Abegglen claimed that he moved "money around just so accounts balanced." CP at 169. In February 2012, EPIC fired Abegglen due to his inability to lawfully manage Head Start funds.

After terminating Walter Abegglen's employment, EPIC's Executive Director Gary Hudson tasked EPIC's controller to investigate the rule violations alleged by HHS. EPIC's controller learned that Abegglen charged expenses incurred in the last quarter of one year to the first quarter of the next year.

Shortly after receiving the January 2012 notice EPIC began experiencing costs to address the financial problems associated with the misuse of HHS grant funds and the prospect of HHS demanding repayment of misused funds. In April 2012, EPIC borrowed

4

$620,000 in anticipation of repayment.

On September 19, 2012, CLA delivered the 2011 audit report to EPIC. The 2011 report identified the misuse of grant funds alleged by HHS and warned that the misuse started at least by the 2009 grant year. Note 12 in the 2011 audit report states:

> Net assets at the beginning of 2011 have been adjusted to properly reflect cash receipts on accounts receivable for prior years and to match grant expenditures without reimbursements applicable to prior years. The adjustment resulted in a decrease in net assets and an increase in accrued expenses of $331,095. The effect of the restatement on the previously reported change in net assets for the year ended December 31, 2010 has not been determined.

CP at 111. The audit report also read:

> As described in items 2011-01, 2011-02, and 2011-03 in the accompanying schedule of findings and questioned costs, EPIC did not comply with requirements regarding cash management and period of availability of federal funds that are applicable to its Head Start Cluster. Compliance with such requirements is necessary, in our opinion, for EPIC to comply with the requirements applicable to that program.

CP at 115. CLA further described the misuse of grant funds in the audit's Finding 2011-02 that stated:

> Condition: EPIC drew down funds from current Head Start grants for expenditures incurred in previous grant years.
> Questioned Costs:
> $448,885 related to November 1, 2010 through October 31, 2011 grant year
> $477,320 related to November 1, 2011 through October 31, 2012 grant year
> Context: During the reconciliation process of accounts receivable and grant draw downs, it was noted that the expenses incurred in the last month of the previous grant year were claimed on the current year grant

5

draw down. This occurred for at least two consecutive prior grant years. The questioned costs noted above are the amounts dawn down on the respective grants to pay expenses incurred in October 2010 and October 2011.

. . . .

Recommendation: Management and the board of directors should establish policies that prevent management override of internal controls and procedures to ensure that expenditures incurred and reimbursed by Head Start are matched in the appropriate period.

Views of Responsible Officials and Planned Corrective Actions: Management acknowledges finding. During the reconciliation process of accounts receivable, grant draw downs, and preparation of the second quarter 2012 draw down report, management discovered a discrepancy in the expense report from 2009. Management is currently working with the office of Head Start to resolve this issue.

CP at 119.

EPIC contends that Chief Financial Officer Walter Abegglen also mismatched expenses with grant funds in years 2007 to 2010. According to EPIC, if CLA had identified these errors in earlier audits, EPIC would not have repeated the error in 2011, and HHS would not have complained of any errors. HHS never detected any regulation violations before the 2011 grant year. Because the earlier CLA audits exposed no accounting errors, EPIC management concluded that EPIC complied with HHS regulations.

EPIC attempted to cure the deficiencies identified by HHS, in its January 17, 2012 notification, by a department deadline of December 31, 2012. EPIC secured a loan for $350,000 to cover the amount of expenses in dispute. We do not know the relationship between the $350,000 loan and the April 2012 $620,000 loan. Unfortunately, the lender

6

did not disburse the $350,000 loan until after January 2013. Accordingly, on February 8, 2013, HHS notified EPIC that it must repay $1,146,039 of the 2011 grant within thirty days. In June 2013, EPIC relinquished its 2013 $7,514,963 grant and its 2014 $12,392,427 grant in order to remain eligible for grants after 2014. In August 2013, HHS agreed to reduce EPIC's repayment amount to $303,287.

According to EPIC Executive Director Gary Hudson, when HHS reduced the amount of repayment in August 2013, EPIC focused on learning how the mismatching occurred, calculating the extent of the mismatching, and ascertaining whether CLA should have uncovered errors earlier. In September 2013, EPIC retained Forensic Accountant Tiffany Couch to investigate whether CLA should have unearthed and warned of the misuse of grant funds in the audits for years 2007-2011. According to Hudson, EPIC first suspected it might have a claim against CLA in September 2013.

After being hired by EPIC, Tiffany Couch contacted CLA on multiple occasions to request accounting work papers pertaining to the audits. CLA refused Couch access without a proper release. We do not know the nature of the release demanded.

Tiffany Couch delivered a preliminary report to EPIC on June 1, 2015. The report found consistent error in EPIC's handling of HHS grant funds in years 2007-2011 that CLA should have detected. Couch concluded that CLA likely violated an auditor's standard of care when failing to unearth the HHS regulation violations beginning with 2007. Couch omitted a formal finding because she lacked access to CLA's working

7

papers. EPIC then filed suit out of frustration from CLA refusing to disclose working papers.

## PROCEDURE

On December 17, 2015, EPIC sued CLA. EPIC asserted claims for breach of contract, professional negligence, and negligent misrepresentation. EPIC alleged that CLA's audit reports for 2007-2011 failed to uncover discrepancies involving HHS grant funds and payment of expenses, thereby resulting in EPIC's epic loss of grant funding. On January 22, 2016, EPIC filed an amended complaint that added more detail to EPIC's alleged damages.

CLA filed a motion to dismiss under CR 12(b)(6) or, in the alternative, for summary judgment under CR 56. In support of its motion, the accounting firm filed the declaration of one of its lawyers, which declaration attached the pertinent engagement agreements and audit reports. CLA contended that EPIC's amended complaint failed to state a claim for the following reasons: (1) the two-year time limitation contained in each of the engagement agreements bars EPIC's claims, (2) the *in pari delicto* doctrine bars EPIC's claims, (3) the complaint fails to plausibly allege how any act or omission of the firm caused EPIC to suffer recoverable damages, and (4) the complaint fails to allege that CLA failed to perform its contractual undertaking and failed to identify a breached contractual provision.

When opposing CLA's motions to dismiss and summary judgment, EPIC filed declarations from Executive Director Gary Hudson and Forensic Accountant Tiffany Couch. Couch opined that the two-year limitation in the CLA engagement agreement is unreasonably short because the auditor's principal will not know of many auditing errors within that two-year period.

In response to CLA's summary judgment motion, EPIC argued that (1) CLA's CR 12(b)(6) motion must be treated as a summary judgment motion since the auditing firm relied on documentation outside the pleadings, (2) the *in pari delicto* defense does not apply because EPIC's agents engaged in no misconduct, (3) the two-year suit limitation deadline in the engagement letter is unreasonably short and unenforceable, (4) CLA's failure to earlier uncover the mismatching of grant funds and expenses in the years 2007-2010 caused EPIC damage by precluding EPIC from avoiding adverse action by HHS, and (5) EPIC's malpractice claim against the accounting firm may be pursued as a breach of contract claim and thus the longer contract statute of limitations applies.

In reply to EPIC's motion response, CLA filed a declaration of Ralph Conner, the partner responsible for EPIC's audits, which declaration attached the January 17, 2012 notification letter from HHS to EPIC.

The trial court granted EPIC's summary judgment motion and the motion to dismiss with prejudice. The court enforced the two-year contract limitation period and ruled the period expired before December 2015.

9

LAW AND ANALYSIS

Motion

EPIC contends the trial court erred when granting CLA's motion to dismiss because the court considered evidence outside the complaint and answer to the complaint. When ruling on a CR 12(b)(6) motion to dismiss, the trial court may generally consider only the allegations contained in the complaint and may not go beyond the face of the pleadings. *Jackson v. Quality Loan Service Corp.*, 186 Wn. App. 838, 844, 347 P.3d 487, *review denied*, 184 Wn.2d 1011, 360 P.3d 817 (2015). When either party submits affidavits, the submittals convert a motion to dismiss into a motion for summary judgment. *McAfee v. Select Portfolio Servicing, Inc.*, 193 Wn. App. 220, 226, 370 P.3d 25 (2016).

In support of its motion to dismiss, CLA filed an affidavit of an audit partner. In opposition to the motion, EPIC filed affidavits of its chief executive officer and its expert accountant. Thus, the motion to dismiss metamorphosed into a summary judgment motion. Nevertheless, the trial court committed no harmful error by granting the motion to dismiss. CLA alternatively moved for summary judgment. The trial court considered the submittals and granted summary judgment in addition to the motion to dismiss. On appeal, we treat the dismissal as based solely on a summary judgment motion.

Appellate courts review a trial court's order granting a motion for summary judgment de novo. *Jackson v. Quality Loan Service Corp.*, 186 Wn. App. at 843 (2015);

10

*Briggs v. Nova Services*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Ranger Insurance Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008); *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). Under summary judgment principles, this court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Casualty Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We conclude that, based on the undisputed facts, the engagement letter's deadline for suit is enforceable and bars both the negligence and breach of contract claims.

### Reasonableness of Contract Limitation Period

EPIC employs a circuitous, but astute, argument on appeal. It focuses on CLA's alleged failure to expose the HHS grant and expenditure mismatch in 2007. EPIC notes that it received CLA's 2007 audit report on March 17, 2008, but it lacked knowledge of

any negligence of CLA and damages resulting therefrom until, at the earliest, February 2013 when HHS notified EPIC of the need to return funds. According to EPIC, the two-year limitation period expired for suit based on the 2007 auditing contract on March 17, 2010, two years after the receipt of the report. Since the law refuses to impose a limitation period that expires before the claimant can assert the claim, this court, according to EPIC, must strike the contract provision. In turn, the court must impose the Washington three-year statute of limitations for the professional malpractice claim and the six-year statute of limitations for a breach of contract claim and apply a discovery rule for each cause of action. Under EPIC's contention, it filed suit within three years of its knowledge of damages in February 2013. Presumably EPIC's same argument would apply to CLA's purported negligence in failing to unearth the mismatch in the audits for the 2008, 2009, and 2010 years.

EPIC emphasizes CLA's failure to identify, in the earlier audit years, EPIC's accounting error. This emphasis prompts the argument that, had CLA caught the error in the 2007, 2008, 2009, or 2010 audits, EPIC would not have repeated the mistake during the 2011 grant year. HHS punished EPIC only for the 2011 error. To our knowledge, HHS lacks notice of the earlier grant year mistakes. EPIC may also focus on earlier years' audits because by the time it received CLA's 2011 audit, it lacked time to correct the error before HHS discovered the regulation violation.

We observe that EPIC's argument assumes that a court should strike the entirety

12

of an unreasonable contractual limitation period, rather than conform the contractual limitation within reasonable constraints. For example, EPIC does not admit that this court could enforce the contractual two-year time limit, but rule that the period commenced when EPIC knew of CLA's violation of the standard of care rather than the date of the receipt of the last audit.

We further note that EPIC's argument assumes that the contractual limitation period for the 2007 to 2011 audits commences to run when it received each of the respective audits. For example, CLA delivered the 2007 audit report on March 17, 2008. EPIC's contention assumes that it needed to file suit for any negligence in preparing the 2007 audit by March 17, 2010. The engagement agreement reads otherwise. For the 2006-2009 audits, any suit needed to be brought within two years of the last audit report issued by the auditing firm. CLA last delivered a report, the 2012 audit report, on June 25, 2013. Therefore, under the audit agreement, EPIC had until June 25, 2015, to file suit based on any audit between 2006 and 2009.

The limitation clauses in the 2010 and 2011 respective audit agreements require suit be brought within two years of the final audit report under that agreement. CLA delivered the 2010 audit report on March 28, 2011, and the 2011 audit report on September 19, 2012. Therefore, as to the 2010 report, EPIC could timely sue by March 28, 2013. EPIC could timely bring any suit based on any error in the 2011 report by September 19, 2014. Note that the limitation period for the 2010 and 2011 audits

13

expired earlier than the 2006-2009 audits, with the period for the 2010 audit expiring first.

Since EPIC attacks the reasonableness of the engagement letter's two-year deadline for filing suit and since EPIC advocates the application of the statute of limitations discovery rule, we probe the date by which EPIC should have known of any breach of duty by CLA. We then compare that date with the first possible date for a deadline in filing suit. That first possible date is March 28, 2013, the contractual time limit for filing suit based on the 2010 report. We then conclude that EPIC possessed a reasonable amount of time to file suit after it should have discovered any breach by CLA.

Parties may agree to a shorter limitations period than provided in a general statute. *Syrett v. Reisner McEwin & Associates*, 107 Wn. App. 524, 527-28, 24 P.3d 1070 (2001); *Yakima Asphalt Paving Co. v. Department of Transportation*, 45 Wn. App. 663, 665, 726 P.2d 1021 (1986). A stipulated limitation period prevails over the general statute of limitations unless prohibited by statute or public policy, or unless the provision is unreasonable. *Wothers v. Farmers Insurance Co.*, 101 Wn. App. 75, 79, 5 P.3d 719 (2000). EPIC only argues the unreasonableness of the CLA engagement letter limitation provision.

On the one hand, the stipulated limitation period is reasonable if the time allowed affords the plaintiff sufficient opportunity to ascertain and investigate the claim and prepare for the controversy. *Syrett v. Reisner McEwin & Associates*, 107 Wn. App. at

14

529. Washington courts have found that contractual limitations clauses ranging from three months to a year are reasonable. *City of Seattle v. Kuney*, 50 Wn.2d 299, 302, 311 P.2d 420 (1957); *Absher Construction Co. v. Kent School District No. 415*, 77 Wn. App. 137, 147-48, 890 P.2d 1071 (1995); *Yakima Asphalt Paving Co. v. Department of Transportation*, 45 Wn. App. at 666 (1986); *Ashburn v. Safeco Insurance Co.*, 42 Wn. App. 692, 695, 713 P.2d 742 (1986). On the other hand, the court will not enforce the contractual limitation period when the cause of action does not accrue before the limitation period expires. *Sheard v. United States Fidelity & Guaranty Co.*, 58 Wash. 29, 35-36, 107 P. 1024 (1910). The law will not require that a plaintiff commence action before its pecuniary loss was capable of ascertainment. *Sheard v. United States Fidelity & Guaranty Co.*, 58 Wash. at 36; *Syrett v. Reisner McEwin & Associates*, 107 Wn. App. at 529.

EPIC's challenge to the limitation period found in the auditor's engagement agreement focuses on the date of the accrual of a claim rather than the length of the limitation period. The date of accrual is the date of receipt of an audit report. Subject to the same principles that apply to contractual modification of a statute of limitations, parties may agree to set the time for accrual of causes of action arising under their contracts. *Washington State Major League Baseball Stadium Public Facilities District v. Huber, Hunt & Nichols-Kiewit Construction Co.*, 176 Wn.2d 502, 513, 296 P.3d 821 (2013). The court will enforce such a provision unless it is contrary to statute, public

15

policy, or it is unreasonable. *Washington State Major League Baseball Stadium Public Facilities District v. Huber, Hunt & Nichols-Kiewit Construction Co.*, 176 Wn.2d at 513. The baseball stadium suit arose from a construction contract, but we see no reason not to apply these principles to an auditing services contract.

CLA argues that, under the language of its auditing contract, its client EPIC's ability to discover its claim is immaterial. CLA emphasizes the language in its later agreements: "The Limitation Period applies and begins to run even if you have not suffered any damage or loss, or have not become aware of the existence or possible existence of a Dispute." CP at 79. We consider such an argument to conflict with *Sheard v. United States Fidelity & Guaranty Co.* CLA cites *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344, 103 P.3d 773 (2004) in support of its argument. Nevertheless, *Adler v. Fred Lind Manor* merely states the general proposition that parties to a contract shall be bound by its terms. *Adler v. Fred Lind Manor*, 153 Wn.2d at 344. Of course, this general rule engenders many exceptions, and courts refuse to enforce many contractual terms.

CLA may argue that its contractual deadline constitutes a period of repose not a suit limitation period. CLA may further argue that a period of repose may be enforced despite the claimant lacking any knowledge of the claim within the stated window of time. Indeed, statutes of repose bar a suit if the claimant has not been damaged within a time period. RCW 7.72.060(1)-(2). Nevertheless, the CLA engagement letter imposes a

16

limitation period not a repose period.

Statutes of repose are of a different nature than statutes of limitation. *Rice v. Dow Chemical Co.*, 124 Wn.2d 205, 211, 875 P.2d 1213 (1994). A statute of limitation bars plaintiff from bringing an already accrued claim after a specific period of time. *1000 Virginia Limited Partnership v. Vertecs Corp.*, 158 Wn.2d 566, 574, 146 P.3d 423 (2006). A statute of repose terminates a right of action after a specified time, even if the injury has not yet occurred. *1000 Virginia Limited Partnership v. Vertecs Corp.*, 158 Wn.2d at 574-75. Although the CLA auditing agreement reads that the deadline for suit will apply even if the client does not discover the harm within the deadline, the agreement contains no express provision that the client must be harmed within a set time frame. Instead, the agreement imposes a deadline for bringing suit.

EPIC argues that it lacked a reasonable opportunity to ascertain that CLA's audits were deficient until HHS issued its disallowance in August 2013. EPIC further argues that, even if we move the date backward to February 2013 when EPIC received HHS' preliminary notice, the two-year deadline for suit is inadequate based on the earliest deadline of March 2013 for the 2010 report. EPIC would own only a month at most to investigate, obtain an expert's opinion of whether EPIC possessed a claim against CLA, consult with and retain counsel, and commence an action arising out of the 2010 audit. Principles of law emanating from the discovery rule disagree.

Under statute, the limitation period begins to run when the plaintiff's cause of

action accrues. RCW 4.16.005. A cause of action accrues when every element of an action is susceptible to proof. *Woods View II, LLC v. Kitsap County*, 188 Wn. App. 1, 20, 352 P.3d 807, *review denied*, 184 Wn.2d 1015, 360 P.3d 318 (2015). In many instances, an action accrues immediately when a wrongful act occurs, but, in some circumstances, a plaintiff can be unaware of the harm until a later time. *1000 Virginia Limited Partnership v. Vertecs Corp.*, 158 Wn.2d at 575 (2006). Under the discovery rule, a cause of action accrues when the plaintiff discovers, or in the reasonable exercise of diligence should discover, the salient facts underlying the cause of action's elements. *1000 Virginia Limited Partnership v. Vertecs Corp.*, 158 Wn.2d at 576. The diligence element of this test is generally a question of fact, but it is proper for the trial court to resolve the issue as a matter of law if reasonable minds cannot differ as to the interpretation of the relevant facts. *Martin v. Dematic*, 178 Wn. App. 646, 653, 315 P.3d 1126 (2013).

HHS notified EPIC of the misuse of Head Start funds on January 17, 2012. The report warned of failing to timely expend grant money and spending one year's grant in another year. EPIC had available then the 2010 audit report in addition to earlier reports. A review of the 2010 report would have confirmed that CLA failed to warn EPIC of its violation of the federal regulations. A review of EPIC's own accounting records would have shown that EPIC violated the regulations in each year beginning in 2007. In January 2012, EPIC still enjoyed fourteen months in which to file suit against CLA.

18

As a result of the January 2012 letter from HHS, EPIC took immediate action, including terminating the employment of its chief financial officer, that confirms EPIC had reason to question the completeness of CLA's audits. After terminating the financial officer's employment, EPIC's Executive Director Gary Hudson tasked EPIC's new controller to investigate the rule violations alleged by HHS. EPIC's controller learned that her predecessor charged expenses from the last quarter of one year to the first quarter of the next year. EPIC began incurring expenses by February 2012 to address the financial problems associated with the misuse of funds and the prospect of having to repay some portion of the misused funds. In April 2012, EPIC took a loan of $620,000 in anticipation of repayment. Therefore, EPIC knew then that any failure to catch the mistake by CLA was reaping damage. EPIC owned then eleven months, in which to sue CLA. In the September 19, 2012 audit report, CLA disclosed such misuse dating back to at least the end of 2009. Washington enforces a deadline as short as three months.

Based on the declaration of its expert, Tiffany Couch, EPIC promotes the reasonableness of delaying suit until the expert conclusively determined that CLA breached the auditor's standard of care. But EPIC's position conflicts with the facts of the case and Washington law. As to the facts, Couch has yet to conclusively determine CLA breached its duty. This corrected fact does not support a ruling that the cause of action has not accrued, but illustrates that even EPIC knows it need not wait until irrefutable proof of any breach of duty.

19

As to the law, the court considers whether the plaintiff had knowledge of the factual basis for the cause of action, not the legal basis. *August v. United States Bancorp*, 146 Wn. App. 328, 342, 190 P.3d 86 (2008); *Germain v. Pullman Baptist Church*, 96 Wn. App. 826, 832, 980 P.2d 809 (1999). Under the discovery rule, the running of the statute of limitations does not toll until a plaintiff consults an expert or until an attorney tells the plaintiff that a defendant breached the applicable standard of care. *Gevaart v. Metco Construction, Inc.*, 111 Wn.2d 499, 501-02, 760 P.2d 348 (1988). Moreover, EPIC does not explain why it needed to wait for Couch to finish her work or why Couch could not have issued her preliminary report much sooner than she did. EPIC does not identify any material fact which it knew when it filed the lawsuit in December 2015 that it did not know by February 2012.

EPIC contends that it did not know the full extent of its damages until after it negotiated with HHS to lower the penalty. This argument helps none, since a cause of action accrues when the plaintiff knows or should know of some damage. When a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm. *Green v. A.P.C.*, 136 Wn.2d 87, 96, 960 P.2d 912 (1998). The statute of limitations does not toll by the fact that further, more serious harm may flow from the wrongful conduct. *Green v. A.P.C.*, 136 Wn.2d at 96. The claimant need not be aware of the full extent of the damages. *Cashmere Valley Bank v. Brender*, 128 Wn. App. 497,

508, 116 P.3d 421 (2005), *aff'd*, 158 Wn.2d 655, 146 P.3d 928 (2006).

EPIC also argues that it needed to minimize its damages before hiring an expert to determine if CLA breached an obligation. Nevertheless, no rule delays the accrual of an action during a time that the plaintiff seeks to minimize damages. EPIC does not illuminate why it cannot minimize damages and hire an expert at the same time.

CLA argues that, even if a contractual limitation period is unreasonable, the court does not strike the entire provision, but strikes the offending portion and enforces the remainder of the contract. CLA states that we could delay the accrual of the claim but enforce the two-year period. Since we hold that the provision as a whole is reasonable under the circumstances, we do not need to address this argument.

## CONCLUSION

We affirm the trial court's dismissal on summary judgment of EPIC's claims against CLA and award CLA costs on appeal.

_____
Fearing, C.J.

I CONCUR:

_____
Korsmo, J.

No. 34540-8-III

SIDDOWAY, J. (concurrence in the result) — We lack information on the magnitude and complexity of the work involved for CliftonLarsonAllen LLP (CLA) to perform the annual Head Start program compliance it promised to perform for Enterprise and Progress in the Community (EPIC).[1] Its base annual audit fee ranged from $23,600 to $29,500 between 2006 and 2011. Depending on the complexity of the compliance work and the aptitudes of EPIC's own employees, timely determining whether CLA committed malpractice might have required EPIC's board of directors to hire an auditor to audit the auditor. If so, I am unwilling to say as a general matter that the contractual limitations period in CLA's engagement letters is reasonable.

---

[1] The 2009 engagement letter, for instance, stated in relevant part:

In addition to our report on Client's financial statements, we will also issue the following types of reports:

. . . .

- Reports on compliance with laws, regulations, and the provisions of contracts or grant agreements. We will report on any noncompliance which could have a material effect on the financial statements and any noncompliance which could have a direct and material effect on each major program.

Clerk's Papers (CP) at 55. The agreement identified "Head Start 93.600" as the only federal financial assistance program that EPIC participated in for purposes of the audit. *Id.* It went on to provide that its report would address "material errors, fraud, abuse, violations of compliance obligations, and other responsibilities imposed by state and federal statutes and regulations." *Id.*

Nor do we need to. The undisputed evidence establishes that EPIC's causes of action against CLA accrued in time for it to have asserted its claims within the contractual limitations period. Where that is the case, there is no need to determine whether the provision should be deemed waived.

Where a limitations provision might unreasonably bar a claim before it can be asserted, the result, announced in our Supreme Court's 1910 decision in *Sheard v. United States Fidelity & Guaranty Co.*, is that the court will infer an intent to waive the provision as to such claims. 58 Wash. 29, 34-35, 107 P. 1024 (1910). In other words, a party cannot attack a contractual limitations period as "facially unreasonable"—instead, the limitation provision is deemed waived in cases where it would be unreasonable as applied. We glean this from *Sheard*'s adoption, as "the correct rule of construction," the rule announced by the Iowa Supreme Court in *Longhurst v. Star Ins. Co.*:

> "If, with reasonable diligence, the value [of the insured interest] cannot be legally ascertained in time to bring an action on the policy within a year from the date of the loss, then it follows (unless you wish to impute a dishonest purpose on the part of the company), that in granting such policy *they intended to waive, in this class of insurable interest, the condition which limits the right of action on the policy to twelve months.* By putting this construction upon the contract of insurance, you preserve the upright intent of the company intact. Whereas, if you put the other construction upon it, you . . . judicially determine, that the company granted a policy for a valuable consideration paid, which at the time they had reason to believe, would be no risk to them and no protection to the insured, and thereby obtained money for themselves under false pretenses. . . . It is the business of the court in construing the contract, to give effect, if possible, to the real intent and expectations of the parties. That can be done only in this case by holding that the fifteenth condition of the policy under discussion, is not

2

applicable to this particular class of insurable interest, and that when the defendant consented to take risks of this kind, it *either intended to waive the limitation, or have it to commence running from the date that the value of the mechanic's lien should be judicially ascertained.*"

*Sheard*, 58 Wash. at 34-35 (quoting *Longhurst*, 19 Iowa 364, 371-72 (1865)) (emphasis added).

"[A] claim [generally] accrues when a party has the right to apply to a court for relief." *Cambridge Townhomes LLC v. Pac. Star Roofing, Inc.*, 166 Wn.2d 475, 485, 209 P.3d 863 (2009). Generally, if the plaintiff is aware of some injury, beyond nominal damage, the statute of limitation begins to run even if he does not know the full extent of his injuries. *Steele v. Organon, Inc.*, 43 Wn. App. 230, 234, 716 P.2d 920 (1986).

As the majority illustrates, EPIC had the right to apply to a court for relief many months before the contractual limitation provision barred its claim. Because the provision did not unreasonably bar *this* claim before it could be asserted, there is no need to examine its reasonableness further.

I concur in the result.

_____
Siddoway, J.

3