[No. 39714.    En Banc.    April 10, 1969.]

LILLIE M. RUTH et al., *Appellants*, v. E. K. DIGHT *et al.*,
*Respondents.**

*Reported in 453 P.2d 631.

*John R. Praeger* (of *Langlie & Praeger*), for appellants.

*Williams, Lanza, Kastner & Gibbs,* by *Henry E. Kastner,* for respondents.

HALE, J.—There is a saying that what one does not know does not hurt him, but, when it comes to surgical operations, this old bromide has turned out to be no more than half a truth. Nature has a mysterious way at times of hiding mishaps in surgery, and cases are legion where foreign objects such as sponges, scalpels, forceps and hemostats have been inadvertently left in a surgical wound and the patient remained oblivious of it for years afterward. Although on discovery of the oversight the surgeon can later provide a medical remedy, the statute of limitations as construed by this court usually blocks a legal remedy.

Plaintiff Lillie M. Ruth commenced this action in 1967 against her surgeon's estate and the hospital alleging medical malpractice committed in 1944. Confronted by the statute of limitations and our rigid application of it in *Lindquist v. Mullen,* 45 Wn.2d 675, 277 P.2d 724 (1954), the trial court ordered plaintiff's complaint against both the estate and hospital dismissed with prejudice, and plaintiff appeals the final order of dismissal. There is no doubt that the principles and rationale declared in *Lindquist* were controlling and that the learned trial judge correctly applied them to the complaint.

The appeal from the order of dismissal—an order final in nature and having the properties of a judgment—renews the question of the statute of limitations; it also questions the application of the nonclaim statute to the doctor's estate.

The first question, however, is whether *Lindquist v. Mullen, supra,* should be overruled. If we overrule it, then we must next decide if the nonclaim statute, RCW 11.40.010, barring claims against a decedent's estate filed more than 6 months after first publication of notice to creditors, precludes a malpractice claim filed long after the 6 months.

The complaint here is designed to bring this case within what has now become a discernible subclassification of medical malpractice cases arising from the presence of foreign articles and substances left inadvertently in surgical wounds and discovered by the patient long after the operation. Plaintiff alleges that in July, 1944, while under the care and treatment of Dr. E. K. Dight, then a practicing physician in Seattle, she was admitted at his direction to Columbus Hospital—an institution since renamed St. Frances Xavier Cabrini Hospital. While there, she alleges, the doctor, acting in conjunction with the hospital and its staff and pursuant to the agreement of patient, doctor, hospital and staff, performed a hysterectomy on her. She says that throughout the surgical procedure she was unconscious from a general anesthetic. She adds that, just before becoming unconscious, she knew that Dr. Dight and a number of nurses and staff members of the hospital were present in the operating room, but that she then became unconscious and remained so throughout the operation.

Plaintiff alleges that, after the operation, her incision healed and she returned to her normal duties, but that she "experienced recurrent pain in her lower abdomen, in varying degrees, which caused extreme pain and discomfort over some period of time." At intervals during the 20-year period following the operation, "plaintiff sought the assistance of physicians" who treated her for her discomfort. Her physicians were unable to determine the source of the pain and " 'heaviness' in her lower pelvic area, but were able to treat plaintiff's symptoms with drugs and with diet restrictions."

The complaint then goes on to say that plaintiff's condition worsened and on February 22, 1966, an exploratory operation was performed on her during which her surgeon

discovered in her lower abdomen a piece of woven fabric called a "surgical sponge" to which the surrounding tissue had become adhered. With the removal of the sponge and closing of the incision, her recovery was uneventful. Plaintiff pleads that, during the nearly 22-year interval between Dr. Dight's operating on her in July, 1944, and a different doctor's removal of the surgical sponge in February, 1966, neither she nor her several attending physicians had "any knowledge of or reason to suspect" the presence of the surgical sponge in her abdomen.

Finally, plaintiff alleges that the sponge was left in her abdomen and resulting injuries incurred because of the negligence of Dr. Dight and the defendant hospital's staff members and employees who were present in the operating room during her operation in July, 1944. She alleges that the defendant hospital had complete control over its operating room and surgical facilities, and over its nurses, anesthesiologists and other staff members present in the surgery during the operation. She asks damages for pain, loss of time from employment, and expenses and costs of the subsequent exploratory surgery from both the estate of Dr. Dight and the Missionary Sisters of the Sacred Heart who owned and operated the hospital.

The record shows that Dr. E. K. Dight, the surgeon who had performed the hysterectomy in July, 1944, died August 21, 1964, and that his surviving spouse, now Evelyn M. Sutton, was thereafter appointed executrix of his estate. Notice to creditors, according to the agreed facts, was first published October 28, 1964, but plaintiff's creditor's claim embodying the instant complaint for malpractice was not filed in the estate until December 1, 1966—about 25 months after the first publication of notice to creditors. Following the estate's rejection of the plaintiff's claim on February 9, 1967, the instant action was commenced March 9, 1967—the estate still being open.

Both the defendant estate and defendant hospital moved to dismiss the complaint on the ground that the action was barred by the 3-year statute of limitations (RCW 4.16.010

and RCW 4.16.080(2)); but defendant estate's motion rests on the additional ground that the nonclaim statute, RCW 11.40.010 and RCW 11.40.080 (precluding claims against decedent estates not filed within 6 months of the first publication of notice to creditors), also bars the instant action.

The problem of applying the statute of limitations correctly in medical malpractice cases has been a vexing one and a continuing source of judicial uncertainty. Our opinion in *Lindquist v. Mullen*, 45 Wn.2d 675, 277 P.2d 724 (1954)—holding that, in cases involving allegations of foreign substances left in surgical wounds, the statute of limitations commences to run when the act occurs, *i.e.*, at the time the foreign article is enclosed in the incision—did little to quiet the matter. Thus, the Lindquist rule has since been under constant intellectual bombardment. These persistent attacks on the rule, illuminating as they do the results fostered by it, now compel us to reexamine the basic reasons for the statute and our interpretation of it to see if our traditional understanding of the legislative intention as asserted in *Lindquist* was correct.

There is nothing inherently unjust about a statute of limitations. Limitations on the time in which one may sue also limit the time in which another may be sued. If one cannot bring an action, by the same token he cannot compel another to defend it. Statutes of limitation, although having their origins in legislative proceedings—aside from equitable principles of laches and estoppel—thus contemplate that a qualified freedom from unending harrassment of judicial process is one of the hallmarks of justice. No civilized society could lay claim to an enlightened judicial system which puts no limits on the time in which a person can be compelled to defend against claims brought in good faith, much less whatever stale, illusory, false, fraudulent or malicious accusations of civil wrong might be leveled against him.

In applying the statutes of limitation, the courts have made many assumptions. Stale claims, from their very nature, are more apt to be spurious than fresh; old evidence

is more likely to be untrustworthy than new. Time dissipates and erodes the memory of witnesses and their abilities to accurately describe the material events. In time witnesses die or disappear, and the longer the time the more likely this will happen. With the passing of time, minor grievances may fade away, but they may grow to outlandish proportions, too. Finally, and not to be ignored, is the basic philosophy underlying the idea that society itself benefits, except in capital cases, when there comes a time to everyone, be it long or short, that one is freed from the fears and burdens of threatened litigation.

While it has been a long cherished ambition of the common law to provide a legal remedy for every genuine wrong, it is also a traditional view that compelling one to answer stale claims in the courts is in itself a substantial wrong. After all, when an adult person has a justiciable grievance, he usually knows it and the law affords him ample opportunity to assert it in the courts. Consequently, as a matter of basic justice, the courts usually have a cogent reason to give limitation statutes a literal and rigid reading, and to declare that the right to sue begins with the wrongful acts and ends with the statutory period unless earlier terminated by laches or estoppel. The Lindquist rationale comports with these principles and assumptions.

But what happens to the concepts of fundamental fairness and the common law's purpose to provide a remedy for every genuine wrong when, from the circumstances of the wrong, the injured party would not in the usual course of events know he had been injured until long after the statute of limitations had cut off his legal remedies? *Lindquist* did not elucidate this aspect of the statute nor seek to strike any kind of balance between two possible harms —the harm of being deprived of a remedy versus the harm of being sued. The problem thus remains with the judiciary, for, unless the legislature has acted definitively, the courts, as instruments of the common law and in furtherance of this traditional role to prevent injustice, should try to strike such a balance.

We do not doubt that the legislature possesses the constitutional power to strike the balance one way or the other and by establishing a clear line of demarcation to fix a time certain beyond which no remedy will be available. Nor do we question that the legislature may resolve the doubts by enacting that all cases on one side of a precise point will be barred and all those on the other may be maintained. Had the statute applicable to medical malpractice cases been drawn with so fine a degree of precision, it is likely that the *Lindquist* decision would have closed the subject because the statute could not rationally be construed to mean otherwise.

But the enactment under scrutiny here (RCW 4.16.010 and RCW 4.16.080(2)), does not speak with such degree of precision in some classes of cases as to bar further inquiry into legislative intentions. The statute describes the actionable event as the accrual of a cause of action—a term susceptible of interpretation from its very nature. In most tort claims, a cause of action will be said to accrue under RCW 4.16.010 with the occurrence of the event—the happening of the act or omission which it is alleged produced the injury. But in reading RCW 4.16.010, as it speaks of the accrual of a cause of action, along with subsection RCW 4.16.080(2), prescribing the kind and classes of actions which are limited to 3 years, *i.e.*, actions "for any other injury to the person or rights of another," we note that the time fixed for calculating the accrual of the cause of action becomes general instead of specific, and could as readily be said to commence with the reasonable discovery of the injury as with the occurrence of the event or omission which produced the alleged injury. And in cases of medical malpractice of the kind now before us—and as in *Lindquist*—where it is asserted the surgeon has negligently left a foreign article, device or substance enclosed in a surgical wound, the patient may be totally oblivious of his injury for years afterward. Thus, a fair resolution of the dilemma involves both a preservation of limitations on the time in which the action may be brought and a preserva-

tion of the remedy, too, where both parties are blameless as to delay in discovery of the asserted wrong.

There is no claim here, as in some of the reported cases, that the physician did anything to conceal the asserted injury, or indeed knew of it, or that he in any way misrepresented the surgery or its results to the patient with any intent to deceive her. For cases loosely described as declaring the fraudulent concealment rule, *see Guy v. Schuldt*, 236 Ind. 101, 138 N.E.2d 891 (1956); *Lakeman v. LaFrance*, 102 N.H. 300, 156 A.2d 123 (1959); *Hinkle v. Hargens*, 76 S.D. 520, 81 N.W.2d 888 (1957). Nor do the proceedings thus far indicate that the plaintiff, in the exercise of reasonable care for her own health and welfare, should have known of her injury. The complaint does allege that plaintiff did not know, and even in the exercise of reasonable care and prudence for her own welfare could not have known, of the surgical sponge in her abdomen. It asserts that, although she did suffer an injury prima facie of the type presumptively attributable to the negligence of medical personnel—*i.e.*, the leaving of a surgical sponge in the abdomen during surgery (*McCormick v. Jones*, 152 Wash. 508, 278 P. 181, 65 A.L.R. 1019 (1929))—she should be accorded the right of asserting that she had no reasonable way of ascertaining that a wrong had been done her.

■ Both reason and experience thus force us to the conclusion that our construction of the statute of limitations in *Lindquist v. Mullen*, 45 Wn.2d 675, 277 P.2d 724 (1954), as it applies to the type of medical malpractice claims arising out of the leaving of foreign bodies or substances in a surgical wound was erroneous, and on that specific point that case should be and is now overruled. We adopt as the rule of this jurisdiction the principle that in those classes of cases where medical malpractice is asserted to have occurred through the negligent leaving of foreign substances or articles in a surgical wound and which remain in the body after the wound has been surgically closed, the statute of limitations (RCW 4.16.080(2)), commences to run when the patient discovers or, in the exercise of reason-

able care for his own health and welfare, should have discovered the presence of the foreign substance or article in his body. This, we think, is the rule adopted by an increasing number of jurisdictions. Prosser, Law of Torts § 30 (3d ed. 1964); *Berry v. Branner*, 245 Ore. 307, 421 P.2d 996 (1966); *Miami v. Brooks*, 70 So. 2d 306 (Fla. 1954); *Rosane v. Senger*, 112 Colo. 363, 149 P.2d 372 (1944); *Davis v. Bonebrake*, 135 Colo. 506, 313 P.2d 982 (1957); *Bowers v. Olch*, 120 Cal. App. 2d 108, 260 P.2d 997 (1953); *Coots v. Southern Pac. Co.*, 49 Cal. 2d 805, 322 P.2d 460 (1958); *Burton v. Tribble*, 189 Ark. 58, 70 S.W.2d 503 (1934); *Crossett Health Center v. Croswell*, 221 Ark. 874, 256 S.W.2d 548 (1953); *Acton v. Morrison*, 62 Ariz. 139, 155 P.2d 782 (1945); *Morgan v. Grace Hospital, Inc.*, 149 W.Va. 783, 144 S.E.2d 156 (1965); *Urie v. Thompson*, 337 U.S. 163, 93 L. Ed. 1282, 69 S. Ct. 1018 (1949); *United States v. Reid*, 251 F.2d 691 (5th Cir. 1958); *Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962); *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959); *Hotelling v. Walther*, 169 Ore. 559, 130 P.2d 944, 144 A.L.R. 205 (1942); *Seitz v. Jones*, 370 P.2d 300 (Okla. 1961); *Fernandi v. Strully*, 35 N.J. 434, 173 A.2d 277 (1961); *Spath v. Morrow*, 174 Neb. 38, 115 N.W.2d 581 (1962); *Johnson v. St. Patrick's Hosp.*, 148 Mont. 125, 417 P.2d 469 (1966); *Thatcher v. De Tar*, 351 Mo. 603, 173 S.W.2d 760 (1943); *Perrin v. Rodriguez*, 153 So. 555 (La. App. 1934); *Adams v. Ison*, 249 S.W.2d 791 (Ky. 1952); and *Billings v. Sisters of Mercy of Idaho*, 86 Ida. 485, 389 P.2d 224 (1964).

Accordingly, in our opinion, the statute of limitations (RCW 4.16.010 and RCW 4.16.080(2)), does not bar this action against the defendant hospital unless, of course, the trier of the facts finds from a preponderance of the evidence, or the court as a matter of law properly concludes, that the plaintiff, in the exercise of ordinary care and prudence for her own health and welfare should have discovered the presence of the surgical sponge in her body more than 3 years prior to commencing this action.

As to the action against the deceased doctor's estate, however, it appears to be barred by the nonclaim

statute relating to the filing of claims in decedent's estates. In contrast to the 3-year statute of limitations (RCW 4.16-.080(2)), the language of the nonclaim statute (RCW 11.40-.010), is more precise and definitive and less susceptible of interpretation. Either a claim against the estate is filed within 6 months of first publication of notice to creditors, or it is barred. Two ministerial acts, each precisely ascertainable in time, fix the time limits: The first publication of notice to creditors and the filing of the creditor's claim. RCW 11.40.010 states:

> Every executor or administrator shall, immediately after his appointment, cause to be published in some newspaper printed in the county, if there be one, if not, then in such newspaper as may be designated by the court, a notice that he has been appointed and has qualified as such executor or administrator, and therewith a notice to the creditors of the deceased, requiring all persons having claims against the deceased to serve the same on the executor or administrator or his attorney of record, and file with the clerk of the court, together with proof of such service, within six months after the date of the first publication of such notice. Such notice shall be published once in each week for three successive weeks. If a claim be not filed within the time aforesaid, it shall be barred. Proof by affidavit of the publisher of the publication of such notice shall be filed with the court: *Provided, however,* In cases where all the property is awarded to the widow, husband or children as in this act provided, the notice to creditors herein provided for may be omitted.

RCW 11.40.080 states:

> No holder of any claim against an estate shall maintain an action thereon, unless the claim shall have been first presented as herein provided.

The nonclaim statute is mandatory and not subject to enlargement by interpretation; and it cannot be waived. *Messer v. Estate of Shannon*, 65 Wn.2d 414, 397 P.2d 846 (1964); *New York Merchandise Co. v. Stout*, 43 Wn.2d 825, 264 P.2d 863 (1953); *Matson v. Wilhelmson*, 198 Wash. 311, 88 P.2d 412 (1939); *First Security & Loan Co. v. Englehart*, 107 Wash. 86, 181 P. 13 (1919).

Although a study of the record does not give us a complete chronology of probate events, it appears that Dr. Dight died August 21, 1964; that his will was admitted to probate October 27, 1964, and the executrix appointed October 22, 1964. An affidavit showing that first publication of notice to creditors occurred October 28, 1964, establishes that October 28, 1964, was the date from which the 6 months would commence to run and that claims filed more than 6 months thereafter would be barred. Not until December, 1966, did plaintiff file a claim in the estate for damages claimed by reason of the alleged malpractice. The claim was rejected by the executor on February 9, 1967, and the instant action commenced March 9, 1967. Thus, having been filed more than 6 months after first publication of notice to creditors, the claim and the action based on it cannot be maintained.

The pleadings and briefs leave some doubt as to whether plaintiff seeks recovery against Evelyn Sutton, widow of Dr. Dight, other than as executrix of the estate. But if it is contended that she is liable on the basis of her surviving membership in Dr. Dight's community and as his spouse when the surgery was done, then the action against her does not lie either, it being also barred by the nonclaim statute. Toward that end, we said in *Graham v. Radford*, 71 Wn.2d 752, 431 P.2d 193 (1967), that the creditor of a community cannot recover against either the community or separate property of the surviving spouse for torts committed by the deceased spouse during coverture when no claim was duly filed against the community assets of the deceased spouse.

■ Nor, in our view, would amendment of RCW 11.40 by Laws of 1967, Ex. Ses., ch. 106, § 3, p. 1879, extending the time for filing tort claims in decedent estates revive this claim against the estate. Nothing in that statute indicates that the legislature intended it to operate retrospectively; consequently, it must be applied prospectively. The statute enacted in 1967, long after the claim had been extinguished, could not be said to have revived it.

Accordingly, the cause is reversed with directions to dismiss all parties defendant except the Missionary Sisters of the Sacred Heart.

ALL CONCUR.

FINLEY, J. (concurring)—I have signed and fully concur in the majority opinion for the cogent reasons expressed therein and the reasons stated in my dissent in *Lindquist v. Mullen*, 45 Wn.2d 675, 277 P.2d 724 (1954).