IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| GREGORY M. TADYCH and R. SUE TADYCH, a married couple, | No. 81948-8-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| NOBLE RIDGE CONSTRUCTION, INC., a Washington Corporation; and WESCO INSURANCE CO., a foreign surety, Bond No.46WB025486, | |
| Respondents. | |

ANDRUS, A.C.J. — Gregory and R. Sue Tadych challenge the summary judgment dismissal of their complaint against Noble Ridge Construction Inc. (NRC) for breach of their construction contract. The trial court dismissed the Tadychs' complaint, concluding that a one-year claim limitations period had expired, making their claim time barred. The Tadychs argue that the claim limitation clause is unenforceable or, alternatively, that NRC should be estopped from asserting it. We disagree and affirm the dismissal.

FACTS

In 2012, the Tadychs and NRC entered into a written agreement for the construction of a custom home in south Seattle. The Tadychs received a draft of

Citations and pin cites are based on the Westlaw online version of the cited material.

the contract on July 22, 2012, and reviewed it for a few weeks before they signed it. They did not seek legal advice, and they signed the contract without requesting any changes to its terms.

For a base price of $485,068, NRC, as the contractor, agreed to provide all necessary labor and materials to construct the Tadychs' residence "in accordance with the Plans and Specifications and (if applicable) Changes Orders accepted and agreed to by the parties hereto." The plans and specifications were incorporated by reference into the agreement. The Tadychs and NRC agreed that neither party would deviate from the plans and specifications without a mutual written agreement to do so. NRC further agreed it would "supervise and direct the Project using reasonable skill and attention and shall satisfy the building codes and standards of municipalities or other governmental agencies with jurisdiction over the Project."

The contract provided that the project would be deemed completed when the building official with jurisdiction over the project established that the home had been built in accordance with the approved plans and specifications and permits, and issued a certificate of occupancy. Upon substantial completion and before occupancy, NRC and the Tadychs agreed they would meet at the project site for a walk-through inspection and prepare a list, referred to as a "punchlist," identifying all components of the project that needed to be completed or corrected.

The contract's warranty provision provided in pertinent part:

**Warranty**. . . . Any claim or cause of action arising under this Agreement, including under this warranty, must be filed in a court of competent jurisdiction within one year (or any longer period stated in any written warranty provided by the Contractor) from the date of

Owner's first occupancy of the Project or the date of completion as defined above, whichever comes first. Any claim or cause of action not so filed within this period is conclusively considered waived. . . .

In December 2013, as the project neared completion, the Tadychs worked with NRC to develop a punchlist of incomplete items. One issue they listed was that "rainwater pools at the landing at the bottom of the stairs." Greg Tadych testified that he personally expressed concern to NRC about this issue throughout the course of the construction. To address pooling rainwater, NRC sketched a proposed modification to the landing proposing to slope it away from the door threshold toward a drain scupper. Greg Tadych testified NRC implemented this fix. The parties' revised punchlist, dated April 2, 2014, reflects that NRC poured a sloped cement surface on the landing and installed tile to direct rain water toward the gutter. The punchlist identified this line item as "closed."

Another item on the December 2013 punchlist was "[n]umerous nicks and cracks on the stucco exterior walls." The revised April 2014 punchlist indicated that "[s]ome work has been done on stucco" and the item remained "open." There is no indication in the record that NRC performed any further work on the exterior stucco to address the identified cracks.

The Tadychs moved into the home on April 8, 2014. The City of Seattle Department of Planning and Development conducted its final site inspection on April 15, 2014, and approved the residence for occupancy on April 23, 2014.

Sue Tadych testified that in late January or early February 2015 she felt a "shift" in the home "as though there had been some unexpected movement in the Project's structure." She reported that "in February 2015 she was working in the

first floor office/bedroom at the NW corner when she heard 'a loud rubbing noise' and it 'felt as though the house shifted south and then down.'" After this event, she noticed that the door to the back patio was no longer even with the casing, there were "humps in the flooring when walking into the master closet and the powder room on the second floor that were not present before the event," the bathtub was no longer level and tilted to the south, floor tiles under and adjacent to the toilet came loose, doors to the roof deck no longer shut properly, and cracks in the drywall appeared.

In February 2015, concerned about this incident, the Tadychs engaged Construction Dispute Resolution, Inc. (CDR) to review NRC's work. According to the consultant agreement the Tadychs signed, CDR provides "consulting and expert witness services relative to construction litigation." For the sum of $1,300, CDR agreed to "[r]eview flooring issues and shift of structure. Advise Client as requested."

CDR raised concerns about the adequacy of the home's construction in its correspondence with the Tadychs. On March 2, 2015, CDR prepared a written report indicating it had identified deviations from the architectural plans and the potential risk of inadequate ventilation of the interstitial areas within the framing of the home. CDR wrote

> All enclosed roof and exposed deck areas together with parapet walls and railings need to be ventilated unless they are completely filled with foam insulation. This is due to the fact that water may condense within the spaces where a conditioned space is adjacent to an unconditioned space; for instance a roof or exterior wall.
>
> . . . .

> [I]n just looking at the photographs of your home and comparing them to the details on the plans we are concerned that there is insufficient ventilation in your walls and roof structures. We are unclear as to whether the architect had issued different designs/directions for the builder to achieve the ventilation required but <u>the lack of 6 inch round holes around your building to ventilate the roof areas and the fact that the metal copings are tight to the walls at your roof parapets indicate the ventilation may not be in place</u>. Together with that, at the roof deck, there is no parapet cap flashing at the metal clad railings. It is a mystery how these are vented.
>
> In summary, either we assume that somehow the architect and builder have achieved the necessary code mandated ventilation as dictated by the plans or some investigative work will have to occur to verify

(Emphasis added). It also stated that the stairs and railings did not conform to the building code or to the plans. CDR noted it could not complete its recommended investigation within the $1,300 previously budgeted amount.

Sue Tadych forwarded CDR's report to Jason Wojtacha, the president of NRC, asking for clarification regarding the ventilation. On March 16, 2015, Wojtacha responded, questioning why the Tadychs had hired a "litigation expert." He assured the Tadychs that NRC had exercised "extra care in achieving the ventilation requirements" for their home. Wojtacha stated that "whatever technique is used is often changed in the field as the conditions on site often change." He stated that there were several different methods of achieving the necessary venting requirements, the 6-inch vents were not aesthetically pleasing, and there was adequate room and ventilation between the floor trusses and the pre-sloped roof trusses. He contended that he had discussed this issue with the Tadychs at

the time the change occurred.[1] Wojtacha stated that the home had a ventilating rain screen system that could not be seen and that system put their "home [] in top 5% of our region, maybe even 1%, in dealing with moisture/vapor and dew points in the northwest region." Wojtacha stated that the rain screen was specifically designed to allow vapor out of the house without allowing additional vapor in by creating a one-fourth inch gap between the wall panels and the stucco. With this system, coupled with the "HRV unit on the inside [of the house] monitoring humidity levels and air flow, you are more than covered" with regard to ventilation.

With regard to the stairs and railings, Wojtacha rejected CDR's contention that they were non-conforming. "[T]he building inspector looked at those areas as well. We specifically had a correction on the roof stair and railing that the inspector zero'd [sic] in on, and he was the one who gave us the remedy to [p]ass the final." He explained that they had had "some minor physical constraints to work with" and asked for clarification from CDR as to what it believed to be non-conforming.

On March 30, 2015, Sue Tadych met with CDR and Wojtacha at the home to discuss the issues CDR had identified in its report, including unlevel flooring, the ventilation issues, and the possibility that the house had settled. According to Sue Tadych, Wojtacha assured her and CDR that there were no issues to be concerned about and that "some settling of like projects was normal and expected." Following

---

[1] Sue Tadych testified that Wojtacha had approached her about modifying the ventilation design. "Jason . . . said he had taken a class and learned how to ventilate the house without having all the caps. I believe there were 18 caps around the outer edge of the building that we both agreed did not look very pleasing." She agreed to allow Wojtacha to make this recommended change to the roof ventilation and had no recollection of consulting the architect before doing so.

this meeting, NRC agreed to repair and did repair some uneven flooring in the master bedroom closet.

On March 13, 2016, Greg Tadych notified NRC that water was again pooling on the second floor exterior stair landing and that there was a crack in the first floor drywall ceiling, which he presumed was related to the pooling water. NRC dispatched someone to assess the situation and, in May 2016, caulked the landing to prevent rainwater from draining into the wall.

Greg Tadych felt that the work NRC did at the landing area was insufficient to resolve the drainage issue and retained Pacific Northeast Inspection Engineers (PNIE) to review the home. PNIE's inspection revealed minor observations about stucco cracking, but did not identify any water intrusion issues.

On October 20, 2016, Sue Tadych noticed water "oozing" from cracks in the exterior stucco panels adjacent to the front door. Alarmed, she went inside and moved a bookcase away from the interior wall adjacent to the exterior cracks. There, she discovered discolored drywall which she suspected was covered in mold. She also documented a crack in window molding in a window by the front door, cracks in the ceiling dry wall, and nail heads that appear wet when it rained. She emailed pictures of these defects to Wojtacha, told him she suspected a leak in the "membrane" somewhere, and demanded that NRC repair the items.

NRC believed the issue was related to the second floor exterior stair landing. On October 25, 2016, Wojtacha and other NRC personnel removed the discolored drywall and insulation behind the exterior wall. They determined that the wall cavity was wet. Wojtacha informed the Tadychs that NRC would have to

- 7 -

pull the second floor exterior stairway door to make the necessary repairs. On November 8, 2016, Sue Tadych contacted Wojtacha to ask when NRC would be available to start the work. Wojtacha assured them NRC would make the repairs and had to work through some scheduling issues. Throughout November and December 2016, the Tadychs contacted Wojtacha on several occasions trying to pin NRC down on a date to make repairs. By email dated December 19, 2016, Wojtacha again assured the Tadyches that NRC intended to repair the leak and asked to put it off until after the holiday season. The Tadychs did not hear from Wojtacha or NRC again.

In early 2017, the Tadychs retained OAC Services to conduct a forensic inspection of the home. OAC determined that significant construction defects exist in the home that must be corrected, including water intrusion issues, code violations, errors in the structural framing, and structure ventilation issues. On August 1, 2017, the Tadychs filed this breach of contract action against NRC. NRC filed a third-party complaint against a number of subcontractors whom NRC asserted were responsible for the defects.

After the Tadychs filed the lawsuit, OAC participated in an intrusive investigation to determine the scope of the defects. It identified cracks in the stucco cladding, defects in the window installation, and inadequate venting to the roof areas. OAC concluded that "[t]he building enclosure which includes below grade, exterior walls and roof assemblies, does not meet the Seattle Residential Code (SRC) Chapter 7 for water resistance. The roof assemblies do not meet the ventilation required under SRC Chapter 8." One of NRC's subcontractors, Master

Stucco, was responsible for installing the stucco cladding system on the house as well as installing the waterproof barrier and metal flashings around windows, doors and openings within the stucco clad wall areas. Wojtacha testified that Master Stucco was supposed to have installed a drainage mat or rain screen as part of its scope of work but it appeared it failed to do so.

OAC also concluded that the house roof trusses and support beams were improperly installed. The defects led to visible cracking in the ceiling, out-of-plumb doors, visible displacement of pavers, and bulging at the floor of the master bedroom closet, powder room, and living space. The framing was not adequately interconnected to resist and transfer imposed loads and did not appear to meet building code requirements. OAC opined that the "damage at the Tadych Residence associated with its structural performance has been caused by defective construction, unsatisfactory workmanship and inadequate detailing."

After discovery, NRC moved for summary judgment, arguing that the Tadychs' lawsuit was time barred under the one-year contractual claim period. The Tadychs filed a cross motion for partial summary judgment seeking a determination that NRC had breached its contract through defective workmanship in the home.

The trial court granted NRC's motion, and denied the Tadychs' cross motion as moot. It subsequently awarded NRC, as the prevailing party, attorney fees of $153,744.35 and costs of $4,651.36 based on an attorney fee provision in the contract.

ANALYSIS

The Tadychs challenge the one-year claim period in the NRC contract as unconscionable. In the alternative, they contend NRC should be precluded from raising the one-year claim provision as a defense under the doctrine of equitable estoppel. We reject both arguments.

We review de novo an order granting a motion for summary judgment. Saralegui Blanco v. Gonzalez Sandoval, 107 Wn.2d 553, 577, 485 P.3d 326 (2021). Summary judgment is appropriate where there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. Id. The moving party bears the burden of demonstrating that there is no genuine issue as to a material fact. Hartley v. State, 103 Wn.2d 768, 774, 698 P.2d 77 (1985).

Whether a contract is unconscionable is a question of law appropriately decided on summary judgment. Nelson v McGoldrick, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995). Whether a defendant should be equitably estopped from raising a particular defense, such as the statute of limitations, presents questions of fact. See Marsh v. Gen. Adjustment Bureau, Inc., 22 Wn. App. 933, 936, 592 P.2d 676 (1979) (whether statements were made and whether plaintiff reasonably relied on such statements are questions of fact). In determining whether the evidence creates a genuine issue of material fact, we consider all facts and reasonable inferences in the light most favorable to the nonmoving party. Sabey v. Howard Johnson & Co., 101 Wn. App. 575, 582, 5 P.3d 730 (2000).

A. Enforceability of the One Year Claim Period

The Tadychs argue the trial court erred in concluding that their claim is time-barred by the one-year claim limitation clause in the NRC construction contract. We disagree.

The statute of limitations for a claim of breach of a written contract is six years. RCW 4.16.040(1). The Tadychs, however, signed a contract in which they agreed to shorten the period in which they could sue NRC to one year. Under the NRC contract, the one-year claims period began to run from the earlier of the date the Tadychs began living in the home or the date they received a final inspection sign-off by the City of Seattle. The record indicates the Tadychs occupied the home on April 8, 2014 and the final inspection occurred on April 15, 2014. The claims period thus ran from April 8, 2014 to April 7, 2015.

The Tadychs do not dispute that they agreed to this one-year claim limitation period. But they maintain that the clause is substantively unconscionable because they could not have discovered the latent defects in their home within that time period.[2] A contract term is substantively unconscionable only where it is "one-sided or overly harsh," "shocking to the conscience," "monstrously harsh," or "exceedingly calloused." Adler v. Fred Lind Manor, 153 Wn.2d 331, 344-45, 103 P.3d 773 (2004). No court has held that a contract clause shortening the time for one party to bring a claim against the other is per se unconscionable. We have

---

[2] The Tadychs also argue that the contract's one-year claim period is procedurally unconscionable. But because the Tadychs failed to raise the issue of procedural unconscionability below, we decline to address it on appeal. See RAP 9.12 (limiting our review of an order granting summary judgment to "evidence and issues called to the attention of the trial court."); Silverhawk, LLC v. KeyBank Nat. Ass'n, 165 Wn. App. 258, 265, 268 P.3d 958 (2011) ("An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal.").

instead recognized that, in general, parties can contractually agree to shorten a statute of limitations period.  Washington State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co., 176 Wn.2d 502, 512, 296 P.3d 821 (2013).

A stipulated limitations period will prevail unless prohibited by statute or public policy or unless the provision is "unreasonable." EPIC v. CliftonLarsonAllen LLP, 199 Wn. App. 257, 271, 402 P.3d 320 (2017); Syrett v. Reisner McEwin & Associates, 107 Wn. App. 524, 527-28, 24 P.3d 1070 (2001).  A contractually shortened limitations period is reasonable in duration if "the time allowed affords the plaintiff sufficient opportunity to ascertain and investigate the claim and prepare for the controversy."  EPIC, 199 Wn. App. at 271.  Washington courts have found contractual limitations clauses of one year or less to be reasonable.  Id. (citing City of Seattle v. Kuney, 50 Wn.2d 299, 302, 311 P.2d 420 (1957) (upheld one year limitation period in construction contract); Absher Constr. Co. v. Kent School Dist. No. 415, 77 Wn. App. 137, 147-48, 890 P.2d 1071 (1995) (dismissal affirmed where contractor failed to bring suit against owner within 120 days of substantial completion as required by contract); Yakima Asphalt Paving Co. v. Dept. of Transp., 45 Wn. App. 663, 665, 726 P.2d 1021 (1986) (180-day limitation period in contract was enforceable)).

The Tadychs contend the contractual claim period is unreasonable because this is a "consumer" contract, not an agreement between sophisticated commercial entities, and one year was an insufficient amount of time to discover the latent defects in their home.  We conclude the consumer cases on which the Tadychs

- 12 -

rely are not applicable here. And the record does not support their contention that they lacked the time to discover the building envelope and structural defects OAC subsequently identified in its 2018 report.

The Tadychs ask this court to apply consumer protection cases in evaluating the validity of the one-year claim period provision in the construction contract. According to the Tadychs, the one year claim provision is unenforceable under Adler, Gandee v. LDL Freedom Enters., Inc., 176 Wn.2d 598, 293 P.3d 1197 (2013), and Dix v. ICT Grp., Inc., 160 Wn.2d 826, 161 P.3d 1016 (2007). We do not find this argument persuasive.

In Adler, the plaintiff alleged his employer terminated him because of his age and his disability in violation of the Washington Law Against Discrimination (WLAD).[3] 153 Wn.2d at 338-40. Adler had signed an arbitration agreement that included a 180-day limitations period for bringing discrimination claims. The Washington Supreme Court held that this provision was substantively unconscionable for three reasons. First, it provided a substantially shorter limitations period than Adler was entitled to under the WLAD. Id. at 355. Second, the limitations period could require employees to forego the opportunity to file discrimination complaints with and have them investigated by the Equal Employment Opportunity Commission or the Washington Human Rights Commission. Id. at 357. Finally, it deprived employees of the continuing violation and tolling doctrines under federal and state discrimination laws. Id. at 356.

---

[3] Ch. 49.60 RCW.

In Gandee, a debt adjustment business sought to enforce an arbitration agreement that required all claims to be submitted to binding arbitration in Orange County, California within 30 days of a dispute. 176 Wn.2d at 602. The Washington Supreme Court held that this provision, which shortened the limitation period from 4 years under the Consumer Protection Act (CPA),[4] to 1 month, was substantively unconscionable based on Adler. Id. at 607.

And in Dix, the plaintiffs filed a class action lawsuit alleging that ICT Group, a customer-service company working for America Online, Inc. (AOL), had violated the CPA by conspiring with AOL to charge users for unwanted additional user accounts created under dubious circumstances. 160 Wn.2d at 829-831. The trial court dismissed the lawsuit because AOL's standard contract included a forum-selection clause dictating that all claims be filed in the courts of Virginia. Id. at 829, 831. In reversing, the Supreme Court held

> Given the importance of the private right of action to enforce the CPA for the protection of all the citizens of the state, we conclude that a forum selection clause that seriously impairs a plaintiff's ability to bring suit to enforce the CPA violates the public policy of this state. It follows, therefore, that a forum selection clause that seriously impairs the plaintiff's ability to go forward on a claim of small value by eliminating class suits in circumstances where there is no feasible alternative for seeking relief violates public policy and is unenforceable.

Id. at 837.

These cases do not support the Tadychs' argument that the contract provision here is substantively unconscionable. First, the Tadychs do not seek to vindicate statutory rights but private contract rights. Second, the one-year claims

---

[4] Ch. 19.86 RCW.

- 14 -

period at issue here is twelve times longer than that in Gandee and at least twice as long as that in Adler. And, unlike Adler, the claims period here does not require the Tadychs to forego other statutory rights to which they are otherwise entitled.

Dix is similarly inapposite. The forum selection clause at issue there effectively precluded the plaintiffs from bringing any lawsuit to vindicate their statutory rights under the CPA. The same cannot be said about the suit limitation clause at issue here. Allowing the parties to contractually shorten their limitations period to a reasonable amount of time does not "seriously impair" their ability to enforce their construction contract rights.

Nor can we conclude that the Tadychs had insufficient time to investigate a claim for breach of contract against NRC. OAC identified three main defects: (1) building envelope issues relating to the stucco cladding resulting in water intrusion into the home; (2) building ventilation issues resulting in vapor from inside the home condensing inside of the home's walls rather than venting to the outside of the home; and (3) structural issues resulting in the shifting and flexing of the building. The Tadychs were on notice of each of these potential defects before April 7, 2015, in sufficient time to investigate a claim and file suit.

First, the Tadychs knew that cracks existed in the stucco as of December 2013 when they developed the initial punchlist with NRC. They also knew that these cracks remained unrepaired in early April 2014 when they received NRC's revised punchlist. While stucco is a cementitious product susceptible to cracking, cracking can be a sign of improper installation of the plywood substrate, uneven stucco thickness, insufficient anchorage to the underlying woven wire lath,

improper positioning of the lath within the stucco, or a lack of adhesion between two coats. The Tadychs had ample time to retain a consultant to evaluate the cause of the known stucco cracking before they occupied the home. They produced no evidence to suggest otherwise.

Second, the Tadychs were on notice of NRC's failure to comply with the roof venting plans and the resultant risk of vapor condensing inside their home's walls and roof by March 2, 2015, the date they received the CDR report. Although CDR indicated that additional investigation was warranted, it is not unusual for parties in construction defect cases to initiate litigation before conducting destructive testing to document the full extent of the defects. Indeed, that occurred here. The Tadychs filed suit in August 2017 and OAC did not begin its intrusive investigation until the fall of that same year. Although the Tadychs may not have known the full extent of the construction defects, they were on notice, at least one month prior to the April 7, 2015 deadline, for initiating litigation that NRC had not constructed the home as required by the plans and that this failure could result in vapor condensing inside the walls of their home.

Finally, the Tadychs knew that the home had shifted in February 2015, two months before the claims deadline, and the shifting was so significant it caused them to fear structural defects. Sue Tadych testified that they saw "unlevel flooring on the second floor" of their home after the shifting incident. They were so concerned that they hired CDR, a litigation consultant, to assist them in reviewing the construction project. While they may not have known why their home had

shifted, they had two months in which to consult an expert, obtain that expert's assessment, and file their lawsuit.

Because the Tadychs had sufficient time to investigate a claim for breach of contract against NRC, the one-year claim period is not unreasonably short in duration.

The Tadychs next argue that we should invalidate the one-year claims period because their claim did not accrue until October 2016, when they discovered that rainwater had intruded into the structure of their home. Washington courts have refused to enforce a contractual limitation period when the cause of action did not accrue before the limitations period expired because "[t]he law will not require that a plaintiff commence action before its pecuniary loss was capable of ascertainment." EPIC, 199 Wn. App. at 272 (citing Sheard v. United States Fidelity & Guaranty Co., 58 Wash. 29, 36, 107 P. 1024 (1910)).

NRC contends the discovery rule does not apply to this contract action because the alleged defects are not latent and RCW 4.16.326(1)(g) makes the discovery rule inapplicable. While we disagree with NRC's legal arguments, we also reject the Tadychs' contention that they did not know the facts underlying their breach of contract claim until after the one year claims period expired.

Generally, a cause of action "accrues when the party has the right to apply to a court for relief." 1000 Virginia Ltd. P'ship v. Vertecs Corp., 158 Wn.2d 566, 575, 146 P.3d 423 (2006). In general, a breach of contract claim accrues on the date of the breach, not on discovery of the breach. Id. at 576 (relying on Taylor v. Puget Sound Power & Light Co., 64 Wn.2d 534, 392 P.2d 802 (1964)). In 1000

Virginia, the Supreme Court created an exception and held that the discovery rule will apply in a breach of a construction contract case where latent defects are alleged.  Id. at 582.

Although NRC concedes the Tadychs alleged the presence of latent defects, it nevertheless argues the defects are not in fact latent.  We cannot agree.  A latent defect is one which could not have been discovered upon inspection.  Arrow Transp. Co. v. A.O. Smith Co., 75 Wn.2d 843, 851, 454 P.2d 387 (1969); Rottinghaus v. Howell, 35 Wn. App. 99, 108, 666 P.2d 899 (1983).  In this case, the defects the Tadychs have identified are latent.  For example, the structural defects outlined in OAC's report were not visible simply by looking at the as-built home.  The only way that the Tadychs could have discovered the improper installation and fastening of the trusses and support beams and improper installation of the stucco, rain mesh, and window flashing was to cut into the home's walls and ceiling to inspect these features.  While the Tadychs could see, upon visual inspection, that the roof lacked the number of vents specified in the plans, they could not see inside the walls to determine if NRC had installed an alternative method of ventilation that would serve the same purpose as the missing six-inch vents.  We agree with the Tadychs that their claim is based on latent defects and the discovery rule under 1000 Virginia applies.

NRC alternatively maintains that RCW 4.16.326(1)(g), enacted while 1000 Virginia was pending, renders the discovery rule inapplicable even to claims of latent defects.  That statute provides:

> (1) Persons engaged in any activity defined in RCW 4.16.300 may be excused, in whole or in part, from any obligation, damage, loss,

or liability for those defined activities under the principals of comparative fault for the following affirmative defenses:

. . . .

(g) To the extent that a cause of action does not accrue within the statute of repose pursuant to RCW 4.16.310 or that an actionable cause as set forth in RCW 4.16.300 is not filed within the applicable statute of limitations. In contract actions the applicable contract statute of limitations expires, regardless of discovery, six years after substantial completion of construction, or during the period within six years after the termination of the services enumerated in RCW 4.16.300, whichever is later; . . . .

RCW 4.16.326(1)(g). The Supreme Court recognized that the legislature enacted this provision in 2003 as "an affirmative defense precluding the application of a discovery rule for claims of breach of written construction contracts." 1000 Virginia, 158 Wn.2d at 582.

But, under the plain language of the statute, it applies only where the "applicable contract statute of limitations" is six years. If the applicable statute of limitations is less than six years, as is the case of a claim based on an oral contract, the discovery rule will still apply. 1000 Virginia, 158 Wn.2d at 582-83. Here, the parties agreed to shorten the limitations period from six years to one. Thus, the applicable statute of limitations is not six years after substantial completion. By contracting for a limitations period of less than six years, the parties took themselves out of the scope of RCW 4.16.326(g)(1). This statute does not apply here and the discovery rule governs the date on which the Tadychs' claim accrued.[5]

---

[5] NRC also contends that the Tadychs agreed that their claim accrued when they first occupied the home. We disagree with this reading of the contract. The Tadychs agreed that any claims accruing within one year of occupancy had to be initiated in that one-year period. There is nothing in the contract to indicate that the Tadychs agreed to waive the discovery rule as to latent defects.

- 19 -

Under the discovery rule, a cause of action accrues when the plaintiff discovers, or in the reasonable exercise of diligence should discover, the salient facts underlying the cause of action's elements. 1000 Virginia, 158 Wn.2d at 576. The Tadychs argue that a material question of fact exists as to when they determined that they had sustained damages. They argue that even if they were on notice of a potential breach of contract by NRC, they had no understanding of the damages being caused by the "systemic and serious defects in NRC's work" until October 2016.

But "[w]here an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once." Green v. A.P.C., 136 Wn.2d 87, 96, 960 P.2d 912 (1998) (quoting Ruth v. Dight, 75 Wn.2d 660, 453 P.2d 631 (1969)). The statute of limitations is not postponed by the fact that further, more serious harm may flow from wrongful conduct. Id. "[T]he running of the statute is not postponed until the specific damages for which the plaintiff seeks recovery actually occur." Id. at 97.

The point at which a plaintiff discovered or should have discovered their injury is ordinarily a question of fact. Winbun v. Moore, 143 Wn.2d 206, 213, 18 P.3d 576 (2001). But this question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion. Ruff v. King County, 125 Wn.2d 697, 704, 887 P.2d 886 (1995). Based on the record here, reasonable minds could only conclude that the Tadychs discovered NRC's breach of contract when they knew NRC had not repaired the cracks in the stucco as required by the punchlist, when they felt their home shift and began to see cracking in the walls

- 20 -

and out-of-plumb doors in February 2015, and when they received CDR's report putting them on notice of defects in the roof ventilation. The Tadychs were on notice that they had experienced "appreciable harm" occasioned by NRC's breach of contract sufficient to support a lawsuit before the one-year claim period expired.

We conclude the one-year claim period to which the Tadychs agreed is valid and enforceable. It is neither substantively unconscionable nor unreasonable because they had time to investigate their breach of contract claim and their claim accrued before the one-year period expired.[6]

B. Estoppel

The Tadychs next contend that NRC should be estopped from relying on the one-year claim period in the contract because it represented to the Tadychs that no defects existed, and then, when those defects became obvious, it misrepresented its intention to repair them.

Estoppel will preclude a defendant from asserting the statute of limitations when the defendant's actions have fraudulently or inequitably induced a plaintiff to delay commencing suit until the applicable period of limitation has expired. Del Guzzi Constr. Co. v. Global Northwest Ltd., 105 Wn.2d 878, 885, 719 P.2d 120 (1986). Equitable estoppel is disfavored and the party asserting it must prove each element by clear, cogent, and convincing evidence. Club Envy of Spokane, LLC v. Ridpath Tower Condo. Ass'n, 184 Wn. App. 593, 601, 337 P.3d 1131 (2014)

---

[6] The Tadychs suggest that if the discovery rule applies, the one-year limitation period runs from the date of discovery. This argument is not supported by the contract language or the case law enforcing contractual claim limitation clauses. We apply the discovery rule only to determine if the contract clause to which the Tadychs agreed is reasonable. Here, the Tadychs' cause of action accrued prior to the running of the one-year time period, making the contract clause enforceable, and it is enforceable as it is written.

- 21 -

(citing Robinson v. City of Seattle, 119 Wn.2d 34, 82, 830 P.2d 318 (1992)).  In order to prevail, the Tadychs must prove (1) the defendant made a statement or an admission, or took some action that is inconsistent with a claim it is now asserting; (2) the plaintiff reasonably relied on that statement, admission, or act; and (3) the plaintiff would be injured if the court allowed the defendant to contradict or repudiate the prior act, statement, or admission.  Id.  When invoked to avoid the statute of limitations, the key question is whether the defendant made representations or promises to perform which lulled the plaintiff into delaying the filing of a timely action.  Peterson v. Groves, 111 Wn. App. 306, 311, 44 P.3d 894 (2002).  When equitable estoppel is rejected on summary judgment, we determine whether the plaintiff presented sufficient evidence to raise a genuine issue of fact on any of the elements of this defense.  See Id. at 310, 314.

We conclude the Tadychs have not sustained their burden of producing evidence to establish that NRC lulled them into not filing a lawsuit before April 7, 2015.  First, while the Tadychs identify a number of statements NRC made regarding its intent to repair identified defects, many of these statements occurred after April 2015 and therefore cannot support equitable estoppel.  Any statements made after the claims period had expired could not have induced the Tadychs to refrain from bringing a timely lawsuit.

The only relevant statements or actions by NRC for purposes of equitable estoppel are those set out in the March 16, 2015 email exchange between Sue Tadych and Jason Wojtacha, NRC's president, and statements Wojtacha made during the March 30, 2015 meeting with the Tadychs and CDR.  But there is no

evidence that in either the March 16 email or the March 30 meeting, NRC asked or encouraged the Tadychs to hold off on filing a lawsuit until it could remedy the defects they or CDR pointed out. While Wojtacha expressed his "hope" that the Tadychs were not considering litigation, NRC did not ask the Tadychs to delay filing suit.

The Tadychs rely on Rouse v. Glascam Builders, Inc., 101 Wn.2d 127, 677 P.2d 125 (1984) and Marsh to support their argument that NRC's repeated assurances that its work was not defective should estop NRC from asserting the one-year claims period as an affirmative defense.

In Rouse, the plaintiff bought a condominium from Glascam Builders. Id. at 128-29. Within the one-year warranty period, Rouse reported a defect in the patio. Id. at 129. Glascam acknowledged the defect and promised to fix it. Id. For several years, Rouse repeatedly contacted Glascam and Glascam repeatedly promised to correct it. Id. Approximately four years after purchasing the home, Rouse filed suit when Glascam changed its position and refused to perform the promised repairs. Glascam asserted Rouse could not prosecute its warranty claim because the warranty itself had expired. Id.

The Supreme Court concluded that Glascam's promises, made within the warranty period, had induced Rouse not to bring legal action and, as a result, it was estopped from raising the contractual warranty period as a basis for denying the homeowner's request for an award of attorney fees under the contract. Id. at 136.

In Marsh, the plaintiff fell on a stairway at a college and filed a claim with the school's insurance representative. 22 Wn. App. at 934-35. The representative told Marsh that he did not believe the school was liable but would still submit her claim. Id. at 935. The representative also told her that it often took between six months and a year to process claims and that Marsh should not be concerned if she did not hear about the claim before then. Id. The statute of limitations on Marsh's claim expired seven months after that discussion. Id. The trial court granted the insurance company's summary judgment motion based on the expiration of the statute of limitations. Id. at 934. Division III reversed and concluded that genuine issues of material fact existed, including whether Marsh reasonably relied on the representative's statement such that equitable estoppel precluded the statute of limitations from barring the claim. Id. at 936.

Rouse and Marsh are both factually distinguishable. Unlike in Rouse, where the defendant repeatedly acknowledged the existence of defects, NRC repeatedly denied that its work was improperly performed and consistently indicated that no defects existed in the home. It is not unusual for one party to a contract to claim a breach occurred and the other party to deny it. Such a denial is not the type of statement, admission or act that would support equitable estoppel.

And unlike Marsh, there is no evidence that NRC ever asked the Tadychs to delay filing suit or indicated that they should wait before doing so. Prior to April 2015 and the expiration of the claims period, NRC did not encourage a delay in litigation by promising to correct defective work and then subsequently fail to

- 24 -

perform that work.  Based on this record, the trial court did not err in concluding that NRC is not estopped from asserting the contractual claims period as an affirmative defense.

C. Attorney Fees

Finally, the Tadychs request that we reverse the trial court's award of attorney fees to NRC and to award it attorney fees on appeal.  NRC in turn asks us to award it fees on appeal.

A party may request an award of attorney fees and costs if the applicable law provides the right to recover fees and costs on appeal.  RAP 18.1(a).  The contract between the Tadychs and NRC provides that "[t]he prevailing party in any dispute over this Agreement shall be entitled to recover from the other party its reasonable costs and attorneys' fees incurred in connection therewith, whether before or at trial, on appeal or in bankruptcy."  Because NRC is the prevailing party on appeal, we affirm the award of attorney fees to NRC below and award attorney fees to NRC on appeal.  Because the Tadychs are not the prevailing party on appeal, their request for fees is denied.

We affirm.

Andrus, A.C.J.

WE CONCUR:

Coburn, J.

- 25 -